**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

GEORGE CHESTER ARTHUR,                    Case No.: 2:14-cv-02083-RFB-DJA

      Petitioner                              **ORDER**

v.

WARDEN NEVEN, et al.,

      Respondents.

This case is a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by George Chester Arthur. This case is before the Court for adjudication of the merits of Arthur's petition. For the reasons discussed below, the Court grants the petition.

**I.    BACKGROUND**

Arthur's convictions are the result of events that occurred in Clark County, Nevada between February 9, 2007, and February 11, 2007. Chrissandra Barnes testified that she, her mother, and her sister, Monica Taitano, came home from an evening out and found her stepfather, Samuel Andrade, deceased on the floor and his vehicle missing. Andrade had been stabbed in the head eleven times, had his throat slit, and had also been stabbed in the chest and back. It was immediately suspected that Arthur, Taitano's estranged, long-term boyfriend, had killed Andrade.

A few days later, law enforcement attempted to perform a traffic stop on Arthur, but after initially stopping in the parking lot of a Wal-Mart store, Arthur drove away from law enforcement, accelerating to speeds of 90 to 100 miles per hour. At least ten other law enforcement vehicles and a helicopter pursued Arthur for 38 miles. Arthur's vehicle was eventually stopped by a spike strip.

Arthur then exited his vehicle and was pursued on foot before being tackled and taken into custody. At that time, Arthur had some bruising, swelling, and scratch marks on his face and some injuries to his right forearm and hands.

Arthur made a telephone call to Taitano while he was in custody and denied involvement in Andrade's murder. Arthur also told a friend the morning after the killing that he received some injuries the previous night from being "jumped by two black guys" at a casino. However, a forensic lab later determined that Arthur's blood and DNA were found in the Andrade home. At his trial, Arthur admitted that he killed Andrade, but he alleged that he acted in self-defense.

Even though he was not welcome at the Andrade home, Arthur testified that he went there on the evening of February 9, 2007, because he wanted to see Taitano, who was living at the Andrade home. Arthur knew that Taitano had gone out that evening with her mother and sister, but he figured that they would have been back home by then.  Andrade answered the door, and, after telling Arthur that they had not yet returned, invited Arthur inside to talk. Andrade directed Arthur to the master bedroom where Arthur believed Andrade would offer him an alcoholic beverage or to "smoke a joint." When they got into the bedroom, Andrade was holding a large knife, told Arthur that he could kill him, and then tried to stab Arthur in the stomach. Andrade cut Arthur "underneath the elbow," and at that point, Arthur testified that he was "scared and terrified . . . of getting killed." Arthur then "had to charge him to try to save [his] life." Arthur and Andrade "struggle[d] for the knife" and "roll[ed] around . . . on the bed."

Arthur did not remember stabbing Andrade or cutting his throat. Rather, the next thing Arthur remembered was being in the hallway bathroom and realizing that "there's blood everywhere." Arthur "came to" while he was driving Andrade's vehicle. He did not remember trying to clean up the crime scene, using a bath towel to soak up Andrade's blood, using a towel

to wash himself off, or where he disposed of his clothes. Andrade pulled the vehicle over, got directions back to the Andrade home, walked back to their residence, got in his own vehicle, and left.

On May 7, 2008, following a jury trial, Arthur was found guilty of burglary and first-degree murder with the use of a deadly weapon. Arthur also pleaded guilty to failing to stop on the signal of a police officer. Arthur was sentenced to 48 to 120 months for the burglary conviction; 20 years to life for the first-degree murder conviction plus an additional and consecutive term of 20 years to life for the deadly weapon enhancement; and 24 to 60 months for the failure to stop conviction. Arthur appealed, and the Nevada Supreme Court affirmed on October 4, 2010. Remittitur issued on November 1, 2010.

Arthur filed a state habeas petition on October 6, 2011. The state district court granted Arthur's petition on April 1, 2013. The State appealed, and the Nevada Supreme Court reversed on November 3, 2014. Arthur then filed his federal habeas petition on December 9, 2014.

Following the Nevada Supreme Court's reversal, the state district court issued a new order denying Arthur's state habeas petition on February 9, 2015. Arthur moved for a stay and abeyance of his federal proceedings pending final resolution of his claims in state court, which the Court granted on September 27, 2016. Arthur appealed the state district court's denial, and the Nevada Supreme Court affirmed on October 13, 2016. Remittitur issued on November 7, 2016.

Arthur moved to lift the stay on his federal proceedings and filed his first amended petition on January 31, 2017. The Court lifted the stay on August 22, 2017. Respondents moved to partially dismiss Arthur's amended petition on March 2, 2018. The Court granted the motion, in part, dismissing ground 2.3 of the first amended petition and deferring ruling on the procedural default

of ground 10. Respondents answered the remaining claims in Arthur's first amended petition on February 25, 2019. Arthur replied on August 26, 2019

Arthur asserts the following violations of his federal constitutional rights:

1. The state district court refused to excuse two jurors for cause;
2. The state district court admitted inadmissible evidence;
3. The state district court improperly allowed a late-noticed witness to testify
4. There was prosecutorial misconduct;
5. His first-degree murder conviction was based on an improper theory of felony murder;
6. Several of the jury instructions were confusing, misleading, or a misstatement of the law;
7. There was insufficient evidence supporting his convictions;
8. There was cumulative error;
9. There was ineffective assistance of his trial counsel;
10. The State improperly shifted the burden of proof; and
11. There was ineffective assistance of his appellate counsel.

## II.   STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." Lockyer v. Andrade, 538

U.S. 63, 73 (2003) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000), and citing <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 75 (quoting <u>Williams</u>, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's application of clearly established law must be objectively unreasonable." <u>Id.</u> (quoting <u>Williams</u>, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> at 102 (citing <u>Lockyer</u>, 538 U.S. at 75); <u>see also</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## III.    DISCUSSION

### A.    Ground 1

In Ground 1, Arthur argues that his federal constitutional rights were violated when the state district court refused to excuse two jurors for cause, namely Cindy Rogers and David Gregware. Arthur explains that his trial counsel was forced to use his peremptory challenges to

remove Gregware and Rogers, and if he had not been forced to do so, he would have used those preemptory challenges on Terrell Otis and Susan Johnson. Id. at 13, 17. Respondents contend that the Nevada Supreme Court correctly focused on the panel that deliberated Arthur's guilt, not on the alleged failure of the state district court to refuse to strike Rogers and Gregware for cause.

In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

Arthur argues that the district court erred by failing to excuse two prospective jurors for cause. A decision to remove a prospective juror for cause remains within the district court's broad discretion. Weber v. State, 121 Nev. 554, 580, 119 P.3d 107, 125 (2005).

Either party may challenge a juror for cause if it is believed that the juror cannot adjudicate the facts fairly, NRS 175.036(1); however, "[t]he test for evaluating whether a juror should have been removed for cause is 'whether a prospective juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Weber, 121 Nev. at 580, 119 P.3d at 125 (quoting Leonard v. State, 117 Nev. 53, 65, 17 P.3d 397, 405 (2001) (internal quotation omitted)).

Here, Arthur contends that he was prejudiced by the district court's error in failing to excuse two prospective jurors. Although one of those prospective jurors represented that she had past experiences with domestic abuse, and the other prospective juror expressed anxiety that he could not manage his business while sitting on the jury, both prospective jurors unconditionally represented that they would be fair and impartial in performing their duties. The district court refused Arthur's request to excuse these prospective jurors for cause, which Arthur claims resulted in prejudice because he then had to exhaust his preemptory challenges and was precluded from later removing two other ultimately impaneled jurors.

Claims of prejudice "based on [ ] 'wasted' preemptory challenge[s] . . . must focus on whether the impaneled jury was impartial." Wesley v. State, 112 Nev. 503, 511, 916 P.2d 793, 799 (1996). On appeal, Arthur requests that we retreat from this standard, but we decline to do so.

Arthur argues that had he not exhausted his preemptory challenges on the two prospective jurors described above, he would have challenged two other specific jurors. Our review of the record indicates that, although one of those other jurors was impaneled initially, she was subsequently removed for health reasons and did not participate in the jury's deliberations. As such, Arthur has failed to demonstrate partiality attributable to this juror. During voir dire, the other juror Arthur indicates he would have challenged if he had not exhausted his preemptory challenges represented that his father had been a victim of a murder but unhesitantly expressed

1   that, despite the potential similarities of the current case with his father's murder,
2   he would be fair and impartial. Because Arthur has failed to establish how this
    juror's participation on the jury panel created a partial jury, we conclude that the
3   district court did not abuse its discretion by refusing to remove the previously
    described prospective jurors for cause and that Arthur was not prejudiced by
4   exhausting his preemptory challenges on those jurors.

5   The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an

6   unreasonable application of clearly established law as determined by the United States Supreme

7   Court.

8           Arthur challenged prospective jurors Gregware and Rogers for cause. Gregware was a

9   "[s]mall business owner" and the "[o]nly person working for [his] business." Gregware had

10  "anxiety about being [at Arthur's trial] because of [his] business," as he was "losing money, and

11  also potential income in the future." Although Gregware indicated that he "could be a fair juror,"

12  Gregware answered in the affirmative when asked if his anxiety "might cause [him] to miss things

13  like testimony" and in the negative when asked if he would "want 12 individuals such as [him]self

14  to be on" his hypothetical jury. However, when the State indicated that the trial was only supposed

15  to last a week or so, Gregware stated that, given that information, he "could give everybody a fair

16  shot and listen to the testimony." The state district court denied Arthur's challenge for cause,

17  explaining that "[t]his man . . . would have said anything he had to say to get off the jury, within

18  bounds of reasonableness." Thereafter, Arthur's trial counsel used a peremptory challenge to

19  remove Gregware.

20          Turning to Rogers, she indicated that she might have a difficult time being unbiased if the

21  facts of the case involved domestic violence between a man and a woman, as she had personal

22  experience with domestic violence. After the state district court told Rogers that the "person that's

23  alleged to have been killed in this case is a man, not a woman," Rogers stated, "[t]hen I would be

a fair, be able to make a fair decision." Rogers also indicated that she "would definitely give it [her] best shot to look at all the facts" and "would be able to be fair." However, following voir dire from Arthur's trial counsel, Rogers stated that she "definitely ha[s] a bias towards men who can't let things go when it's over" and questioned "[w]hy someone would go to someone's house where they didn't live and be there or why they couldn't accept the end of a relationship and continue to harass someone." In denying Arthur's challenge for cause, the state district court stated that it did not believe that Rogers would "be particularly biased or not a fair juror." Arthur's trial counsel then exercised a peremptory challenge on Rogers.

Arthur's trial counsel indicated that if Gregware and Rogers had been stricken for cause, he would have used his preemptory challenges on Terrell Otis and Susan Johnson instead. Otis's "father was the victim of a homicide." And Johnson indicated that she was "very emotional and sensitive" and would probably have an emotional response to graphic pictures that may cloud her judgment. Otis served on the jury, but Johnson was excused prior to the matter being submitted to the jury.

The United States Supreme Court has held that, while the Constitution guarantees a defendant the right to an impartial jury, the fact that a defendant is required to use a peremptory challenge to cure a trial court's error in denying a challenge for cause does not constitute a constitutional violation. The Court stated:

> We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

Ross v. Oklahoma, 487 U.S. 81, 88 (1988) (internal citations omitted) (explaining that "[a]ny claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat"). Indeed, "if

1    the defendant elects to cure [a trial court's erroneous for-cause ruling] by exercising a peremptory

2    challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been

3    deprived of any . . . constitutional right." United States v. Martinez-Salazar, 528 U.S. 304, 307

4    (2000); see also Rivera v. Illinois, 556 U.S. 148, 157 (2009) ("If a defendant is tried before a

5    qualified jury composed of individuals not challengeable for cause, the loss of a peremptory

6    challenge due to a state court's good-faith error is not a matter of federal constitutional concern.").

7         The Nevada Supreme Court reasonably concluded that the state district court did not err in

8    rejecting Arthur's challenges for cause. No prospective juror Arthur challenged for cause was

9    seated on his jury, as Arthur did not lodge a challenge for cause against Otis or Johnson. Further,

10   after reasonably noting Johnson's dismissal before the submission of the case to the jury, the

11   Nevada Supreme Court reasonably determined that Arthur failed to demonstrate how Otis'

12   participation made the jury impartial. In fact, although his father was murdered, Otis clearly

13   indicated that "notwithstanding [that] experience [he] could be a fair juror." Because Arthur has

14   not shown that a biased or unqualified juror served on his jury, Arthur has not shown that his voir

15   dire did not meet constitutional requirements. See Skilling v. United States, 561 U.S. 358, 395

16   n.31 (2010). Thus, because the Nevada Supreme Court reasonably denied Arthur's claim, Arthur

17   is denied federal habeas relief for Ground 1.

18        **B.    Ground 2**

19        In Ground 2, Arthur argues that his federal constitutional rights were violated when the

20   state district court admitted several pieces of inadmissible evidence, namely evidence that Arthur

21   had a history of domestic violence, a recording of a jailhouse call, the 911 call, and testimony that

22   Arthur had been previously incarcerated. These four pieces of evidence will be discussed

23   individually below.

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), as amended on reh'g, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see also Lewis v. Jeffers, 497 U.S. 764 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Therefore, the issue before the Court is "whether the state proceedings satisfied due process." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due process." Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (citing Estelle v. McGuire, 502 U.S. 62, 67 (1991)). Not only must there be "*no* permissible inference the jury may draw from the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial." Jammal, 926 F.2d at 920 (emphasis in original) (citation omitted).

### 1.    Domestic Violence Evidence

Arthur argues that the admission of domestic violence evidence violated his due process rights to a fair trial. Arthur also argues that the state district court failed to give a limiting instruction informing the jury of the limited way in which it could use the domestic violence evidence. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> Arthur argues that the district court improperly admitted evidence of prior bad acts without first conducting a hearing pursuant to Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), or providing a limiting jury instruction. The State counters that the evidence was admissible because it was offered to rebut a false impression of Arthur's conduct and character created by defense counsel's cross-examination of a witness.

> "The trial court's determination to admit or exclude evidence of prior bad acts is a decision within its discretionary authority and is to be given great deference." Braunstein v. State, 118 Nev. 68, 72, 40 P.3d 413, 416 (2002). "It will not be reversed absent manifest error." Id. In analyzing the propriety of admitting evidence of prior bad acts, the trial courts are instructed to follow the parameters of NRS

48.045(2) and weigh the probative value of the evidence against the risk of unfair prejudice. Id. at 72-73, 40 P.3d at 416-17. We have previously determined that when a defendant creates an impression of his character, the State may offer similar evidence as rebuttal so long as the evidence "squarely contradict[s] the . . . false impression" cause by the defendant's evidence. Jezdik v. State, 121 Nev. 129, 140, 110 P.3d 1058, 1065 (2005); see also U.S. v. Beltran-Rios, 878 F.2d 1208, 1212 (9th Cir. 1989) ("We previously have allowed the Government to introduce otherwise excludable testimony when the defendant 'opens the door' by introducing potentially misleading testimony.").

On direct examination of the witness, the State diligently avoided asking questions related to Arthur's prior acts of domestic violence or his character. However, during cross-examination of the witness, Arthur's counsel engaged in a series of questions that portrayed Arthur as acting childlike when he was intoxicated. Prior to the State's rebuttal examination of the witness, the parties sought clarification from the district court as to the proper scope of the State's rebuttal examination. In compliance with the district court's guidelines, the State's rebuttal evidence did not highlight specific instances of domestic violence or convictions but was limited and tailored to evidence rebutting the impression of Arthur's conduct and character while intoxicated. As such, we conclude that the State's rebuttal evidence squarely contradicted Arthur's impression of his character and conduct and that the district court did not abuse its discretion by allowing the State to pursue this line of questioning.

The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

At the trial, during Arthur's trial counsel's cross-examination, Taitano testified that Arthur "would have to be sober, just to even come around [Andrade's] house." Taitano then explained that she would sometimes have to treat Arthur like a child when he had been drinking. During the State's redirect examination of Taitano, the following colloquy occurred:

> Q.    [Defense counsel] also asked you some questions about [Andrade] and other members of the family not liking to be around the Defendant when he was drunk. Do you remember those questions?
> A.    Yes.
> Q.    Is one of the reasons that you didn't - - he didn't like the Defendant around when he was drunk because he would become violent with you?
> A.    Yes.
> Q.    Sometimes when he was drunk would he put his hands on you?

A.      Yes.

Q.      Did that create problems in your relationship?

A.      Yes.

Q.      And [Andrade] was aware of these problems; was he not?

A.      Yes.

Q.      Was that one of the reasons [Andrade] did not want the Defendant around if he was drinking?

A.      Yes.

Arthur's trial counsel objected to the State's foregoing line of questioning, and a bench conference was held. That bench conference was later put into the record, whereby the State explained that it believed that Arthur's trial counsel had "opened the door to domestic violence on the part of Mr. Arthur towards Monica Taitano." The state district court agreed, ruling that "the State was going to be allowed to go into prior bad acts of Mr. Arthur towards Ms. Taitano, specifically domestic violence and whether or not he laid his hands in the past on Ms. Taitano and . . . that's why he had been removed from the house."

Regarding the admission of the domestic violence evidence, the Nevada Supreme Court, the final arbiter of Nevada law, determined that Nevada caselaw provides that the State may offer evidence rebutting a defendant's evidence that creates an impression of his character—here using the domestic violence evidence to rebut Arthur's evidence that he acted childlike when intoxicated. And Arthur has not demonstrated that the lack of a limiting instruction in this instance is a constitutional issue. See Tavares v. State, 30 P.3d 1128, 1132 (Nev. 2001) ("[T]he failure to give a limiting instruction on the use of uncharged bad act evidence is a nonconstitutional error."). Therefore, the issue before the Court is only whether the admission of this evidence was so prejudicial that it rendered Arthur's trial so fundamentally unfair as to violate due process. Estelle, 502 U.S. at 70; Jammal, 926 F.2d at 919-20 ("The issue for us, always, is whether the state

12

proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point.").

Arthur urges the Court to review this claim *de novo* because the Nevada Supreme Court only addressed whether the domestic violence evidence was admissible and failed to address his constitutional arguments. The Nevada Supreme Court did not specifically address Arthur's constitutional arguments, but the Court must nonetheless presume that the Nevada Supreme Court adjudicated and rejected that aspect of the claim on the merits. See Johnson v. Williams, 568 U.S. 289, 301 (2013). Even reviewed *de novo,* however, the claim falls short of warranting habeas relief.

Although Taitano's testimony that Arthur would sometimes become violent and put his hands on her when he was intoxicated may have been somewhat prejudicial to Arthur, it cannot be determined that it rendered Arthur's trial fundamentally unfair in violation of due process. Estelle, 502 U.S. at 70. Indeed, the State did not question Taitano about specific instances where Arthur became violent with her, the State moved on from this line of questioning relatively quickly, and Taitano diluted her own statement by also testifying that she had to treat Arthur like a child when he was intoxicated. Further, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Yarborough, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); see also Dowling v. United States, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly"). And importantly, the Supreme Court "has not yet made a ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Id. Accordingly, Arthur is denied federal habeas relief for Ground 2.1.

### 2.    Jailhouse Call

Arthur argues that the jailhouse telephone call between himself and Taitano was disclosed very late thereby preventing him from changing his defense, had little purpose other than to inflame the jury, allowed one witness to comment on his veracity, and contained other information that the jury should never had learned about, such as his custodial status. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> Arthur asserts that the district court committed error when it admitted a recorded jailhouse phone conversation between Arthur and a woman who eventually became a witness at trial because (1) the State did not produce this recording for discovery until the first day of trial, (2) comments made during the phone conversation were irrelevant or improper, (3) the phone conversation revealed Arthur's custodial status, and (4) the conversation was improperly recorded. "We review a district court's decision to admit or exclude evidence for an abuse of discretion." Ramet v. State, 125 Nev. __, __, 209 P.3d 268, 269 (2009).
>
> *Late disclosure of recorded phone conversation*
>
> Arthur argues that the State violated its duty under NRS 174.235(1)(a) to timely disclose, during discovery, the recording of his jailhouse phone conversation wherein Arthur made statements that contradicted his self-defense theory at trial. Similarly, NRS 174.295(1) requires a party who subsequently discovers additional material that is subject to discovery to "promptly notify the other party or the other party's attorney or the court of the existence of the additional material." A district court, however, has broad discretion to establish a remedy under NRS 174.295. Evans v. State, 117 Nev. 609, 638, 28 P.3d 498, 518 (2001). The court "does not abuse its discretion absent a showing that [a party] acted in bad faith or that the nondisclosure caused substantial prejudice." Id.
>
> Here, Arthur concedes that the State's late disclosure of the recorded phone conversation was not in bad faith. A review of the record indicates that Arthur never requested a copy of the recorded phone conversation, as required by NRS 174.235(1), and upon discovery of the recorded conversation, the State promptly notified Arthur's counsel and provided counsel with a copy of it. Furthermore, Arthur was a party to the conversation and had knowledge of the statements he made that contradicted his self-defense theory at trial. He cannot now claim to have been prejudiced by its admission. See Rippo v. State, 113 Nev. 1239, 1257, 946 P.2d 1017, 1028 (1997) (concluding that where a defendant had previously spoken with a witness, the defendant had notice of the potentially incriminating evidence and could have reasonably discovered it). Although the State did not disclose the recorded jailhouse phone conversation until the morning of the first day of trial, we

conclude that the district court did not abuse its discretion by admitting the recording.

*Comments in the recorded phone conversation*

Next, Arthur argues that the recorded phone conversation is inadmissible because it contains inappropriate comments by the other party to the call concerning Arthur's credibility and character, consisting of the repeated statement that Arthur is a liar. Generally, "[e]vidence of a defendant's character is inadmissible to prove that he or she acted in conformity with that character trait on the occasion in question unless certain exceptions apply." Somee v. State, 124 Nev. 434, 446, 187 P.3d 152, 160 (2008) (citing NRS 48.045).

In this case, a careful review of the record surrounding the district court's decision to admit the phone conversation reveals that, after listening to the recording of the jailhouse phone conversation, the district court expressed concern over the comments about Arthur's credibility and character. The court acknowledged that it typically does not allow witnesses to accuse defendants of lying; however, the district court determined that the phone conversation was relevant and offered Arthur the option of giving a limiting instruction to the jury or redacting the specific comments where he is called a liar. Arthur refused the limiting instruction because he considered it to be ineffective and declined to redact the improper comments because it would draw unnecessary attention to them. Because Arthur made a decision to not redact the comments concerning his credibility or character, we conclude that it was not an abuse of discretion for the district court to admit the recorded jailhouse phone conversation under those circumstances.

*Arthur's custodial status*

Arthur further challenges the recorded jailhouse phone conversation arguing that it improperly revealed his custodial status. A defendant is "entitled to not only the presumption of innocence, but also to indicia of innocence." Haywood v. State, 107 Nev. 285, 288, 809 P.2d 1272, 1273 (1991). This includes the right "to appear before the jury without physical restraints." Id. at 287, 809 P.2d at 1273. Verbal references to a defendant's in-custody status "have the same prejudicial effect as bringing a shackled defendant into the courtroom." Id. at 288, 809 P.2d at 1273.

In this case, the phone conversation was recorded in the days immediately following Arthur's arrest. We conclude that any inference of Arthur's custodial status that can be implied from the phone conversation is limited to Arthur's custodial status at the time of his arrest and not necessarily his custodial status at the time of trial. Simply because a juror learns that a defendant was in custody at the time of his arrest, it cannot be reasonably presumed that the juror will believe that the defendant is still in custody at the time of trial. Additionally, on direct examination, Arthur independently testified that he was in jail at the time the phone conversation was recorded; and defense counsel, while cross-examining another

15

witness, referenced that Arthur had been in custody for the last year and nine months. Therefore, we conclude that the recorded jailhouse phone conversation was not prejudicial as it did not reveal Arthur's custodial status at the time of trial, and any prejudice that can be attributed to Arthur's custodial status is a direct result of testimony elicited from Arthur and comments made by Arthur's counsel.

*Phone conversation was properly recorded*

In his final challenge to the recorded phone conversation, Arthur asserts that it was improperly recorded. NRS 209.419 expressly grants detention centers the authority to record phone conversations so long as signs are posted near the telephone giving notice that the conversation may be intercepted. Our review of the record indicates that signs were posted near the telephone at the time of Arthur's phone conversation, and a recording was played at the initiation of the conversation notifying the parties that the conversation would be recorded. Therefore, we conclude that Arthur's argument is without merit.

Following the selection of the jury, Arthur's trial counsel informed the state district court that he got an email from the State "telling [him] there was an audio tape of a phone call of [Arthur] and his de facto wife, Monica" and that "[t]he basis of the conversation . . . is essentially that she asked him what had happened." In the recording, Arthur stated that he did not know, and Taitano "call[ed] him a liar, time after time after time." Arthur's trial counsel requested that the state district court exclude the recording in its entirety due to the late disclosure or redact the portions of the recording where Taitano called Arthur a liar.

After listening to the telephone conversation, the state district court allowed the recording to be admitted into evidence, but it indicated that it "would entertain the possibility of a limiting instruction to the jury indicating that the response by the young lady is not for the truth of the matter asserted." Arthur's trial counsel elected not to redact portions of the recording. The state district court explained that it allowed the telephone call recording because "[i]t certainly militates against the defendant's theory of the case," as Arthur's defense at trial was that he acted in self-defense whereas he denied involvement during his telephone call with Taitano.

The admission of the jailhouse telephone call between Taitano and Arthur had a substantial and injurious effect on the jury's verdict. Indeed, the State's late disclosure severely prejudiced Arthur. Because Arthur denied knowing what happened to Andrade in the jailhouse telephone call, the jailhouse telephone call played a substantial role in refuting Arthur's self-defense theory, especially when considered in combination with the late disclosure of Lori Rios' testimony, which also undermined his self-defense theory, as is discussed in Ground 3.[1] Arthur's trial counsel only learned about the existence and content of the jailhouse telephone call on April 29, 2008, the day before giving their opening statement on April 30, 2008. Had Arthur and his counsel known about this damaging jailhouse telephone call and Rios' testimony discussed in Ground 3 before the trial began—rather than learning about them, respectively, during voir dire and after giving opening statements—it is almost certain that Arthur would have abandoned his self-defense theory in lieu of a defense not directly contradicted by the state's late-disclosed evidence. Instead, as is discussed further in Ground 3, Arthur was blindsided by the State's improper late disclosure of these pieces of evidence without adequate time to switch to a more fruitful defense. As the record indicates, the preparation of a case and theory of defense for a case involving a murder clearly takes months, so allowing the disclosure and admission of unknown substantially damaging evidence during trial, as here, renders a defendant's preparation meaningless and results in a fundamentally unfair trial in violation of due process. Indeed, this is the very reason that prosecutors have constitutional and ethical obligations to immediately disclose evidence material to innocence or guilt to a defendant

---

[1] The Court also rejects that Nevada Supreme Court's argument that there was no harm since Arthur was a participant of the call and should have known of its contents. Due process and fairness, especially in the context of the disclosure obligations of the government, have never turned on a defendant's memory of events. Evidence can be deployed in many ways and for a variety of reasons, so disclosure is essential for a defendant to have a fair understanding of the evidence to be used against them.

in criminal case. Consequently, the Nevada Supreme Court's denial of this claim amounts to an objectively unreasonable application of federal law. Accordingly, under a *de novo* review,[2] this Court concludes that the state district court's failure to exclude the jailhouse telephone call rendered Arthur's trial fundamentally unfair in violation of due process. Arthur is granted federal habeas relief for Ground 2.2.[3]

### 4. Previous Incarceration

Arthur argues that Andrade's wife's testimony improperly divulged to the jury that he was previously incarcerated. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> Arthur contends that the district court improperly denied a motion for a mistrial after a witness testified that Arthur had been previously incarcerated. A district court's decision to deny a motion for mistrial is reviewed for an abuse of discretion. Ledbetter v. State, 122 Nev. 252, 264, 129 P.3d 671, 680 (2006). "A witness's spontaneous or inadvertent reference to inadmissible material, not solicited by the prosecution, can be cured by an immediate admonishment directing the jury to disregard the statement." Carter v. State, 121 Nev. 759, 770, 121 P.3d 592, 599 (2005).
>
> In this case, the State was questioning the witness about certain family members' living arrangements when the witness made the statement about Arthur's prior incarceration. Arthur immediately approached the bench and requested a mistrial, which the district court addressed outside the presence of the jury. The district court denied Arthur's motion but offered to provide a curative instruction, which Arthur declined because he believed it would draw more attention to the statement. When the jury returned to the courtroom, the district court did not issue an admonishment and the State immediately moved on to a different line of questioning. Although the district court did not admonish the jury, the witness's statement was isolated and unsolicited by the State. Therefore, we conclude that the district court did not abuse its discretion by denying Arthur's motion for mistrial or by not admonishing the jury.

---

[2] See Panetti v. Quarterman, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires").

[3] Ground 2.3 was previously dismissed. ECF No. 55.

The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Carol Andrade, Andrade's wife, testified that her daughter, Taitano, and her children came to live with her and Andrade while Taitano and Arthur were having relationship issues. When the State asked Carol if Arthur was still living in Colorado when she picked up her grandson, Carol responded, "[h]e was there, but he was in jail." Id. at 10. Arthur's trial counsel requested a bench conference and asked the state district court to declare a mistrial based on the statement about his previous incarceration. The state district court denied the request, stating that it believed that the statement "was an unfortunate accident" and that it was not "particularly damaging." Id. at 46. The state district court offered to give a curative instruction, but Arthur's trial counsel denied the offer. Id.

Although Carol's statement that Arthur was previously incarcerated had no permissible inference, it cannot be concluded that this statement rendered Arthur's trial fundamentally unfair in violation of his due process rights. Estelle, 502 U.S. at 67; Sublett, 63 F.3d at 930; Jammal, 926 F.2d at 920. As the Nevada Supreme Court reasonably noted, Carol's statement was isolated, and as such, cannot be considered especially inflammatory. See Hovey v. Ayers, 458 F.3d 892, 923 (9th Cir. 2006) (explaining that "even if there are no permissible inferences the jury can draw from the evidence in question, due process is violated only if the evidence is 'of such quality as necessarily prevents a fair trial'" and reasoning that "[w]e have held that admission of far more

1  inflammatory evidence did not violate due process"). Because the Nevada Supreme Court

2  reasonably denied Arthur's claim, Arthur is denied federal habeas relief for Ground 2.4.[4]

3      **C.    Ground 3**

4      In Ground 3, Arthur argues that his federal constitutional rights were violated by the

5  admission of witness Lori Rios' testimony. In affirming Arthur's conviction on direct appeal, the

6  Nevada Supreme Court held:

> Arthur contends that the district court improperly permitted a witness to testify although she was not properly noticed on the State's witness list. NRS 174.234 requires that the State must provide the name and last known address of each witness that it intends to call at trial. The State acknowledges that NRS 174.234 also imposes a continuing duty to supplement its witness list. "[F]ailure to endorse a witness constitutes reversible error only where the defendant has been prejudiced by the omission." Jones v. State, 113 Nev. 454, 473, 937 P.2d 55, 67 (1997). In Dossey v. State, we determined that an endorsement disclosing the witness's place of employment but not the witness's name was sufficient because the defense could have discovered the witness's identity with "minimal and reasonable efforts." 114 Nev. 904, 907, 964 P.2d 782, 784 (1998). And, even if a witness is erroneously endorsed, "the proper remedy is a continuance, not exclusion of the witness's testimony." Id. at 908, 964 P.2d at 784.

> Here, the State noticed the witness on its witness list but listed the witness's address as unknown. The State represented that it never knew the witness's address and therefore could not supplement its witness list. Arthur likewise included the witness on his witness list that he provided to the State. Despite including the witness on his own witness list, Arthur argues that, without the witness's contact information, he did not have an opportunity to interview the witness prior to trial and discover the content of her testimony. The district court permitted the witness to testify, finding that the State did not act in bad faith when it failed to ascertain contact information for the witness and then supplement its witness list.

> At trial, the witness, a relative and neighbor of the victim, testified that one month prior to the murder, Arthur commented to her that he was sent to kill the victim. Notwithstanding the witness's condemning testimony, Arthur was able to conduct a thorough cross-examination of the witness. Furthermore, once the district court permitted the State to call the witness to testify at trial, Arthur did not request a

---

[4] Arthur argues that he is entitled to relief based on the cumulative impact of the evidence addressed in Ground 2. ECF No. 66 at 37-38. The Court agrees that cumulative error warrants relief in this case, but disagrees that this cumulative error arises solely from the asserted errors under Ground 2.

continuance in order to interview the witness and discover the content of her testimony.

We conclude that, with reasonable efforts, Arthur could have discovered the witness's contact information. And, because Arthur included the witness on his witness list, Arthur cannot now complain that he did not have proper notice or knowledge of the witness's testimony prior to trial. Additionally, Arthur was able to adequately challenge the witness's testimony on cross-examination. Under these circumstances, we conclude that Arthur was not prejudiced by the State's failure to provide the witness's contact information and reversal is not warranted.

Arthur argues that he never included Rios on his witness list, so the Nevada Supreme Court's decision was based on an unreasonable determination of the facts. This Court agrees. Although this "fact" was likely based on Arthur's trial counsel's misstatement at trial that he "actually put [Rios] on our witness list," Rios did not appear on Arthur's witness list. Therefore, because the Nevada Supreme Court's decision was based on an unreasonable determination of the facts, this ground will be reviewed de novo.[5] See Panetti v. Quarterman, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires"); Hurles v. Ryan, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that . . . the state court's decision was based on an unreasonable determination of the facts, we evaluate the claim de novo.").

Lori Rios was listed on the State's Notice of Witnesses. Her address was listed as unknown. On April 30, 2008, the first day of presentation of evidence at the trial, during a bench conference, the State mentioned "a previous threat" that Arthur had made against Andrade. The next day, May

---

[5]Even if the Nevada Supreme Court's decision was not based on an unreasonable determination of the facts—for example, if this Court gave credence to Arthur's trial counsel's misstatement at trial that he "actually put [Rios] on our witness list"—this Court would still find that Arthur is entitled to relief on Ground 3 because, for the reasons discussed below, the Nevada Supreme Court's conclusion that Arthur was not prejudiced by the late disclosure of Rios' testimony involves an unreasonable application of clearly established Federal law.

1, 2008, the State called Rios during its case-in-chief. After the State asked Rios some preliminary

questions, Arthur's trial counsel requested a bench conference because "it became apparent she

was going to testify to" the threat that was mentioned the previous day. During the bench

conference, Arthur's trial counsel explained the following: (1) Rios' statements were not included

anywhere in the discovery materials, and (2) he had not spoken to Rios before trial because he did

not know her address or telephone number and "was unaware of the contents of her specific

testimony." In response, the prosecutors explained that they did not have a telephone number or

address for Rios, and, although they had listed Rios as a possible witness a month before trial, they

had only learned the contents of Rios' testimony the week before trial. Arthur's trial counsel

requested that the state district court exclude Rios' testimony. The state district court denied the

request, explaining that (1) it did not "see any glaring oversight on the part of either side" regarding

noticing and investigating Rios and (2) Arthur is only entitled to a fair trial, not a perfect one.

Rios, who was Andrade's niece, testified that Arthur came over to her home on December

30, 2006, a little more than a month before Andrade was killed. During that visit, Arthur "stated

[to Rios] that God had sent him here to kill" Andrade because Andrade "always talked smack

about everybody." Rios took this threat seriously and told other family members. Rios later saw

Arthur in the vicinity of the Andrade residence on the night that Andrade was killed.

This Court finds that the state district court's failure to exclude Rios' testimony rendered

Arthur's trial fundamentally unfair in violation of due process. Estelle, 502 U.S. at 70. On April

30, 2008, during opening statements, Arthur's trial counsel announced Arthur's defense: he killed

Andrade in self-defense. Later that day, during a bench conference, Arthur's trial counsel learned

for the first time from the State that it had a witness who would testify that Arthur had previously

threatened Andrade's life.[6] Most damning and troubling is that the State was aware of Rios'
proffered testimony <u>several days</u> before trial and only disclosed it <u>after</u> defense counsel's opening
statement. This evidence, which was presented the next day during Rios' testimony, completely
and directly rebutted Arthur's theory of defense that had just been presented to the jury. The
harmful effect of this improper late disclosure was, as noted, compounded by the other similarly
improper late disclosure of the jailhouse call and its contents to the defense. Specifically, Arthur's
theory that he went to the Andrade home looking for Taitano and was attacked unexpectedly by
Andrade was repudiated by the jailhouse call and Rios' testimony that Arthur has previously
expressed his desire to kill Andrade. Because Arthur was already committed to his theory of self-
defense at the time the defense learned of this significantly damaging evidence, it was too late for
Arthur and his counsel to shift to a different defense theory, alter their trial strategy to better combat
this evidence, or further pursue pre-trial negotiations. Indeed, in light of the other evidence casting
doubt on Arthur's self-defense theory, namely the actions he took after the murder, it appears
significantly likely that knowing Rios' testimony prior to trial would have swayed Arthur and his
defense team to entirely abandon the self-defense theory. As the defense's knowledge of Rios'
testimony was gained after the defense had already locked itself into a defense—now a failing

---

[6] As the State knew about Rios' testimony before the trial started, it clearly violated its legal and
ethical obligations by withholding the contents of Rios' testimony from the defense. This
deception was made even more egregious and compounded by the fact that the State chose not to
amend its notice of witnesses prior to trial to include Rios' contact information, which it
presumably obtained during its interview of her. This inaction effectively hindered any chance that
the defense would learn about Rios' testimony on its own before the trial started. Contrarily, as is
further explained in Ground 9.3(b), this Court also does not intend to imply that Arthur's trial
counsel acted deficiently because (1) there was no apparent need to investigate Rios given that she
had never made a witness statement to police and given that Arthur denied making any statement
to Rios, and (2) trial counsel has no obligation to investigate every witness on a witness list. <u>See</u>
<u>Strickland</u>, 466 U.S. at 691 (1984) ("In any ineffectiveness case, a particular decision not to
investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy
measure of deference to counsel's judgments").

defense—the state district court's failure to exclude Rios' testimony rendered Arthur's trial fundamentally unfair in violation of due process.

This Court also finds, as noted, that the admission of Rios' testimony "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-38 (1993)). Arthur did not dispute at trial that he killed Andrade. Rather, the dispute at trial centered on whether Arthur acted in self-defense in killing Andrade. Rios' testimony that Arthur told her that God had sent him to kill Andrade about a month before Arthur killed Andrade goes to the heart of the State's argument that Arthur did not act in self-defense. Indeed, the only evidence regarding Arthur's state of mind came from Rios' and Arthur's conflicting testimonies. Consequently, Rios' testimony was substantial and materially injurious, so the trial court's failure to exclude Rios' testimony was not harmless.

Arthur is granted federal habeas relief for Ground 3.

### D.     Ground 4

In Ground 4, Arthur argues that his federal constitutional rights were violated when the State committed multiple acts of misconduct during its closing argument. Specifically, Arthur alleges that the State improperly disparaged him and his defense and then improperly pleaded with the jury to "strike a blow for justice."

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)); <u>see also</u> <u>Brown v. Borg</u>, 951 F.2d 1011, 1017 (9th Cir. 1991) ("Improprieties in closing arguments can,

themselves, violate due process."). A court must judge the remarks "in the context in which they are made." <u>Boyde v. California</u>, 494 U.S. 370, 385 (1990). The fairness of a trial is measured "by considering, inter alia, (1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused." <u>Tan v. Runnels</u>, 413 F.3d 1101, 1115 (9th Cir. 2005). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Wood v. Ryan</u>, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting <u>Brecht</u>, 507 U.S. at 637-38).

**1.    Disparagement**

Arthur contends that the State's comments suggesting that the defense team made up his claim of self-defense was improper. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> Arthur argues that the State inappropriately undermined and disparaged his self-defense theory by suggesting that the defense concocted this theory to fit the evidence. In particular, Arthur contends that he was disparaged by the prosecutor's comments during closing argument that self-defense "has not always been [Arthur's] defense" and "[Arthur] says self-defense now because he can no longer say he wasn't there." Defense counsel objected to the latter comment.
>
> On review of the record illustrates that the prosecutor focused his attention on the testimonial evidence adduced at trial and properly depicted the deficiencies in Arthur's defense. The prosecutor later acknowledged the elementary standards for self-defense and demonstrated that the evidence presented did not support the defense. We conclude that the prosecutor's comments did not unfairly result in a denial of due process nor were they prejudicial to Arthur.

The State made the following comment during closing argument:

> Of course, the Defense stands up in front of you and asks you to find the defendant not guilty. This is the self-defense defense. But there's something very important that I tried to illustrate at the end of my cross-examination of the defendant, and that's this. That while that is his defense today, it has not always been his defense.

1    Following Arthur's trial counsel's objection to the foregoing comment and the state district court's

2    overruling of the objection, the State continued:

3        He makes a phone call to Monica, the one person, by the way, he probably would
         say he cares about the most, the one person that you would expect he would be
4        honest with.

5        And what does he do to her? In his own words, he lied. And what does he say?
         They got me on that old bench warrant. He doesn't mention anything about the fact
6        that he ran from the cops related to the murder of Samuel Andrade.

7        She asks him: Hey, why did you run? I wasn't running. That's what he says back
         then. I was leaving, leaving town. For what? How come they caught you out in
8        Moapa? I was going to get fireworks. That's his story then.

9        What else does he say? I wasn't there. I have an alibi. Hey, I told them what
         happened, I was out on Alexander Street. My alibi is myself. That's his story. That's
10       the defense the defendant puts forth back in February of 2007.

11       So why is it important? Because, ladies and gentlemen, that's the defense he puts
         forward. And I would submit to you based on your observations, you probably
12       know that the defendant isn't the brightest guy in the world.

13       He probably doesn't have a lot of education, and he probably didn't think through
         exactly what he was doing when [he] cleaned up the crime scene. He may not have
14       realized that the blood that he left behind could be traced back to him. But that's
         his defense back then before.

15

16   Arthur's trial counsel objected again, but the state district court overruled the objection.

17   The State continued:

18       Here's the facts. He makes that statement in his defense to the person he cares about
         most before he knows that the cops are going to find his DNA. And not in one
19       place, or two, or three, four, or even five, but he makes those statements back then
         before his DNA is found in over 20 places in Sam Andrade's car and in Sam
20       Andrade's house.

21       That's what the defendant says then. What does he say now? Well, he took the
         witness stand. He put forth his version of what happened and he says self-defense.
22       Why does he say self-defense now? He says self-defense now because he can no
         longer say he wasn't there. He says self-defense because he's got to. He's got to
23       because his DNA is painted all over Sam Andrade's house.

Several minutes later, the State commented:

> I would submit to you that a conviction of second degree murder would probably
> be better for this defendant than a conviction of first degree murder. And I would
> submit to you that's one reason why they bring it up.
>
> But I would submit to you there's another reason as well. The more they can make
> him look like a bumbling, happy drunk, the kind of drunk who talks like a little kid
> and gets kicked out of the house, the less he looks like the mean, angry drunk who
> has been allowed around the family.

### 2.    "Strike a Blow" Comment

Arthur contends that the State's "strike a blow" comment implored the jury to ignore the evidence and the beyond a reasonable doubt standard.

Before the case was submitted to the jury, the State made one final comment:

> Ladies and gentlemen, the defendant's sole purpose in those actions was to kill Sam
> Andrade. It is now your purpose, as the jury instructions describe, that your sole,
> fixed and steadfast purpose of providing equal and exact justice for both the
> defendant and the State of Nevada. It is your opportunity, ladies and gentlemen, to
> strike a blow, not a blow as this defendant did causing death, but it is your
> opportunity to strike a blow for justice and find him guilty.

In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> The prosecutor concluded his closing argument by imploring the jury to "strike a
> blow for justice." Arthur failed to object to the prosecutor's final comment but now
> argues that it was inappropriate. "Generally, the failure to object [at trial] precludes
> appellate review absent plain error." Browning v. State, 124 Nev. 517, 533, 188
> P.3d 60, 71 (2008). To constitute plain error, the "'error must be so unmistakable
> that it is apparent from a casual inspection of the record.'" Nelson v. State, 123
> Nev. 534, 543, 170 P.3d 517, 524 (2007) (quoting Garner v. State, 116 Nev. 770,
> 783, 6 P.3d 1013, 1022 (2000), overruled on other grounds by Sharma v. State, 118
> Nev. 648, 655, 56 P.3d 868, 872 (2002)).
>
> In support of his argument, Arthur relies on U.S. v. Beasley where the prosecutor
> invoked the jury to be part of the "war on drugs." 2 F.3d 1551, 1559-60 (11th Cir.
> 1993). The Beasley court determined that the comments were improper and were
> an "appeal by the prosecutor for the jury to act as 'the conscience of the
> community,'" and "were 'calculated to inflame.'" Id. at 1560 (quoting United
> States v. Bascaro, 742 F.2d 1335, 1354 (11th Cir. 1984), abrogated on other

grounds by U.S. v. Lewis, 492 F.3d 1219, 1221-22 (11th Cir. 2007)). Notably, however, the court concluded that the comments did not amount to reversible error. Id.

We similarly conclude here that the prosecutor's comment for the jury to "strike a blow for justice" was inappropriate and calculated to inflame the jury. However, when viewed in context of the entire record and the substantial evidence of guilt, the prosecutor's final comment did not affect Arthur's substantial rights, and therefore, did not amount to plain error. See Nelson, 123 Nev. at 543, 170 P.3d at 524.

### 3.    Analysis

The State is allowed to criticize defense theories and to comment on the facts presented at the trial during closing argument. See United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument."); see also United States v. Lopez-Alvarez, 970 F.2d 583, 597 (9th Cir. 1992) ("[T]he propriety of the prosecutor's remarks must be judged in relation to what would constitute a fair response to the remarks of defense counsel."); Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (concluding that the State's improper closing argument did not infect the trial with unfairness because "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence"). The State, however, is prohibited from making comments intended to inflame the jury. See United States v. Weatherspoon, 410 F.3d 1142, 1149 (9th Cir. 2005) ("We have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury"); United States v. Nobari, 574 F.3d 1065, 1077 (9th Cir. 2009) (finding that "[t]he prosecution's comment was an improper appeal to jurors' emotions and fears").

Because the State's "strike a blow" comment was made for the sole purpose of inflaming the jury, it was improper. Turning to the State's comments disparaging Arthur's defense, on the surface, these comments appear to be properly denouncing the theory of defense. However, in light

of the State's failure to meet its legal and ethical obligations regarding the timely disclosure of the jailhouse telephone call and Rios' testimony, which directly negated Arthur's theory that he acted in self-defense, the Court finds that the State improperly trapped Arthur into a losing self-defense theory—as was discussed, in part, in Grounds 2.2 and more thoroughly in Ground 3—and then capitalized on its intentional failure to disclose during closing argument by commenting that Arthur's self-defense theory lacked support. As such, the State's disparagement was also improper. While these inappropriate comments alone may not provide a basis for finding a due process violation, when considered in combination with the State's improper conduct regarding the jailhouse telephone call and Rios, these improper comments rendered Arthur's trial fundamentally unfair in violation of due process. Consequently, the Nevada Supreme Court's denial of these claims amounts to an objectively unreasonable application of federal law. And because these instances of prosecutorial misconduct had a substantial and injurious influence in determining the jury's verdict, Arthur is granted federal habeas relief for Ground 4.

### E.    Ground 5

In Ground 5, Arthur argues that his federal constitutional rights were violated because first-degree murder cannot be based on an improper theory of felony murder. Arthur explains that the State tautologically used the homicide as the basis for the burglary and the burglary as the basis for the homicide. Arthur further explains that if the intended crime was the homicide, as the State alleged, then the burglary occurred during the commission of the homicide and the felony murder doctrine does not apply. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> The State charged Arthur with burglary and murder, among other charges, and specified in the indictment that the murder charge rested on alternative theories of liability, including felony murder—"killing . . . during the perpetration or attempted perpetration of burglary." In the burglary charge, the State alleged that Arthur

entered the victim's home with the "intent to commit an assault and/or battery and/or a felony." Arthur extrapolates that the use of the terms "and/or a felony" is a disguise for homicide or murder and that the felony murder doctrine should not be applied when, as here, the predicate felony of burglary is based upon entering the residence with the intent to commit murder.

In <u>State v. Contreras</u>, this court held that Nevada's statutory scheme allows for a felony murder charge where the predicate felony is burglary. 118 Nev. 332, 336-37, 46 P.3d 661, 664 (2002). In reaching this conclusion, we adopted the rationale in <u>People v. Miller</u>, 297 N.E.2d 85 (N.Y. 1973), that any burglary, including one based on intent to assault, justifies application of the felony-murder rule, and stated that "[w]e do not believe it is appropriate to apply the merger doctrine to felony murder when the underlying felony is burglary, regardless of the intent of the burglary." 118 Nev. at 336-37, 46 P.3d at 663-64. Arthur argues, however, that in <u>People v. Cahill</u>, 809 N.E.2d 561 (N.Y. 2003), the New York Court of Appeals "retreated from an overly-expansive interpretation of the felony-murder doctrine" in <u>Miller</u>, thus undermining our decision in <u>Contreras</u>.

In <u>Cahill</u>, the court determined that the New York statute that "elevates intentional murder [committed during a burglary] to capital-eligible murder" requires that the defendant's intent underlying the burglary be independent of the intent to murder. 809 N.E.2d at 587. Otherwise, "the class of those eligible for the death penalty . . . would widen." <u>Id.</u> at 589. Understandably, the *Cahill* court emphasized that because <u>Miller</u> interpreted New York's felony-murder status, not its capital-punishment statute, "<u>Miller</u> is distinguishable on the facts and in its legal premise." <u>Id.</u> The court further stated that "we leave our body of felony murder jurisprudence intact." <u>Id.</u> However, even if <u>Cahill</u> modified or overruled <u>Miller</u>, that case is not binding on this court and, thus, we conclude that Arthur's argument lacks merit and we need not revisit our holding in <u>Contreras</u>.

The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Nev. Rev. Stat. § 200.030(1)(b) provides that "[m]urder of the first degree is murder which is . . . [c]ommitted in the perpetration or attempted perpetration of . . . burglary." And Nev. Rev. Stat. § 205.060 provides that burglary occurs when "a person . . . by day or night, enters any house . . . with the intent to commit . . . assault or battery on any person or any felony." The language used in Arthur's indictment adheres to these definitions. Indeed, the indictment charged Arthur

30

with murder with the use of a deadly weapon, which the State alleged occurred under the following principles of criminal liability: "(1) by having premeditation and deliberation in its commission; and/or (2) the killing occurring during the perpetration or attempted perpetration of burglary." And the indictment charged Arthur with burglary, alleging that Arthur "willfully, unlawfully and feloniously enter[ed Andrade's home], with intent to commit an assault and/or battery and/or a felony." Because the States have the power "to define criminal offenses," Jackson v. Virginia, 443 U.S. 307, 324 n.16 (1979), and because the indictment in the case accurately reflects Nevada's law defining first degree murder and burglary, Arthur has failed to establish a basis for the Court to grant relief. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005); see also Carey v. Musladin, 549 U.S. 70, 77 (2006). Arthur is denied federal habeas relief for Ground 5.

**F.    Ground 6**

In Ground 6, Arthur argues that his federal constitutional rights were violated because several of the jury instructions were confusing, misleading, or a misstatement of the law. Specifically, Arthur takes issue with Jury Instruction Nos. 16, 19, 20, 24, 33, and 38. Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991); see also Gilmore v. Taylor, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error."). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)).  When reviewing a jury instruction, the Court considers that jury instruction "in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72; see also United States v. Frega, 179 F.3d 793,

806 n.16 (9th Cir. 1999) ("In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation."). Furthermore, jurors are presumed to follow the instructions that they are given. United States v. Olano, 507 U.S. 725, 740 (1993). Even if an instruction contains a constitutional error, the Court must then "apply the harmless-error analysis mandated by Brecht[ v. Abrahamson, 507 U.S. 619 (1993)]." Calderon v. Coleman, 525 U.S. 141, 146 (1998). The question is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." Id. at 145.

### 1. Jury Instruction No. 16

Arthur argues that Jury Instruction No. 16 improperly emphasized how quickly premeditation can be formed and was at odds with the same instruction's definition of deliberation. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> Arthur argues that the district court erred when instructing the jury on premeditation because the instruction "improperly emphasized the rapidity with which premeditation can be formed." . . .
>
> The language in jury instruction no. 16 tracks verbatim the instructions "we set forth . . . for use by the district courts in cases where defendants are charged with first-degree murder based on willful, deliberate, and premeditated killing." Byford v. State, 116 Nev. 215, 236-37, 994 P.2d 700, 714 (2000). Arthur acknowledges that this instruction comports with Byford but argues that emphasizing the instantaneous nature of premeditation undermines the requirement of deliberation. We decline to revisit Byford and conclude that Arthur's argument lacks merit and reversal is not warranted on this issue.

The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Jury Instruction No. 16 provides:

> Murder of the first degree is murder which is perpetrated by means of any kind of willful, deliberate, and premeditated killing. All three elements - - willfulness,

deliberation, and premeditation - - must be proven beyond a reasonable doubt before an accused can be convicted of first-degree murder.

Willfulness is the intent to kill. There need be no appreciable space of time between formation of the intent to kill and the act of killing.

Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the actions.

A deliberate determination may be arrived at in a short period of time. But in all cases the determination must not be formed in passion, or if formed in passion, it must be carried out after there has been time for the passion to subside and deliberation to occur. A mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill.

Premeditation is a design, a determination to kill, distinctly formed in the mind by the time of the killing.

Premeditation need not be for a day, an hour, or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the act follows the premeditation, it is premeditated.

As the Nevada Supreme Court reasonably acknowledged, Jury Instruction No. 16 mirrors the instruction formulated by the Nevada Supreme Court "for use by the district courts in cases where defendants are charged with first-degree murder based on willful, deliberate, and premeditated killing." Byford v. State, 994 P.2d 700, 714 (Nev. 2000). Additionally, contrary to Arthur's urgings, Jury Instruction No. 16 does not inappropriately emphasize how quickly premeditation can be formed. Arthur contends that Jury Instruction No. 16 provides that "if premeditation is instantaneous then no jury will be able to convict a person of second-degree murder," but Arthur misstates Jury Instruction No. 16's language. Jury Instruction No. 16 does not provide that premeditation can be instantaneous, but rather it provides that premeditation "may be as instantaneous as successive thoughts of the mind." And importantly, Jury Instruction No. 16

1  also clearly explains that premeditation must be "formed in the mind by the time of the killing,"

2  not contemporaneous with the killing. <u>See id.</u> Accordingly, this claim lacks any legal or factual

3  foundation, whether on *de novo*[7] or deferential review. Arthur is denied federal habeas relief for

4  Ground 6.1.

5                    **2.    Jury Instruction No. 19**

6         Arthur argues that Jury Instruction No. 19, the felony murder instruction, was confusing

7  and misleading.. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court

8  held:

9         Jury instruction no. 19 instructed jurors that felony murder presumes premeditation
          and malice aforethought; however, Arthur argues that the instruction may have
10         been confusing and misleading. . . .

11         Despite arguing that the instruction is confusing and misleading, Arthur
          acknowledges that it is a correct statement of the law. Because the instruction is a
12         correct statement of the law, we conclude that the jury was properly instructed and
          that Arthur has failed to demonstrate that his substantial rights were affected.

13

14  The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an

15  unreasonable application of clearly established law as determined by the United States Supreme

16  Court.

17         Jury Instruction No. 19 provides:

18         There is a kind of murder which carries with it conclusive evidence of
          premeditation and malice aforethought. This class of murder is murder committed
19         in the perpetration or attempted perpetration of burglary. Therefore, a killing which
          is committed in the perpetration of such a burglary is deemed to be Murder of the
20         First Degree, whether the killing was intentional or unintentional or accidental. This
          is called the Felony-Murder rule.

21
          The intent to perpetuate or attempt to perpetuate the burglary must be proven
22         beyond a reasonable doubt.

23         _____
               [7] Arthur urges the Court to review this claim *de novo* because the Nevada Supreme Court
          never considered the constitutional implications of Jury Instruction No. 16. ECF No. 66 at 55.

                                        34

Arthur contends that "[w]here the intended offense was the homicide, the felony-murder rule and, hence, the presumption of premeditation/malice does not apply." However, Arthur fails to explain how Jury Instruction No. 19 conflicts with this idea. Jury Instruction No. 19 clearly states that the killing must be "committed in the perpetration or attempted perpetration of burglary" in order for the felony murder rule to apply. It does not provide the opposite—that the burglary can be committed in the perpetration of the homicide for the rule to apply—as Arthur seems to argue. Therefore, because Arthur fails to persuade the Court that Jury Instruction No. 19 is confusing or misleading in violation of his due process rights, whether on *de novo*[8] or deferential review, Arthur is denied federal habeas relief for Ground 6.2.

### 3.    Jury Instruction No. 20

Arthur argues that Jury Instruction No. 20 improperly suggested that the jury must unanimously reject first-degree murder before it can consider a lesser offense, thereby minimizing the State's burden of proof. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> Arthur also asserts that jury instruction no. 20 requires that the jurors unanimously reject first-degree murder before considering second-degree murder. . . .
>
> Arthur contends that this instruction misstated the jury's legal obligations and minimized the State's burden of proof because the jury should have returned a lesser verdict if any juror had reasonable doubt about whether the crime charged was murder in the first degree. Jury instructions that improperly minimize the State's burden of proof can be considered a violation of the defendant's constitutional due process rights. <u>Francis v. Franklin</u>, 471 U.S. 307, 313 (1985). We conclude that jury instruction no. 20 is not a misstatement of the law. When considered in its entirety, the final paragraph of jury instruction no. 20 instructs the jurors that if there is reasonable doubt whether the murder was committed in the first or second degree, then the jury must return a verdict of second-degree murder.

---

[8] Arthur urges the Court to review this claim *de novo* because the Nevada Supreme Court never considered the constitutional implications of Jury Instruction No. 19. ECF No. 66 at 57.

1    Accordingly, we conclude that the instruction did not mislead or confuse the jury
2    and Arthur's due process rights were not violated.

3    The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an

4    unreasonable application of clearly established law as determined by the United States Supreme

5    Court.

6        Jury Instruction No. 20 provides:

7        You are instructed that if you find that the State has established that the defendant
         has committed first degree murder you shall select first degree murder as your
8        verdict. The crime of first degree murder includes the crime of second degree
         murder. You may find the defendant guilty of second degree murder if:
9            (1) some of you are not convinced beyond a reasonable doubt that the
                 defendant is guilty of murder of the first degree, and
10           (2) all twelve of you are convinced beyond a reasonable doubt that the
                 defendant is guilty of the crime of second degree murder.
11       If you are convinced beyond a reasonable doubt that the crime of murder has been
         committed by the defendant, but you have a reasonable doubt whether such murder
12       was of the first or of the second degree, you must give the defendant the benefit of
         the doubt and return a verdict of murder of the second degree.

13

14       Arthur fails to demonstrate how Jury Instruction No. 20 is misleading or inadequate. The

15   charge in this case instructed the jury to enter a verdict on first-degree murder only if they could

16   unanimously agree that Arthur was guilty of first-degree murder. It did not instruct the jury

17   impermissibly under Nevada law that it could consider second-degree murder only if jurors

18   unanimously agreed that Arthur was not guilty of first-degree murder. See Green v. State, 80 P.3d

19   93 (Nev. 2003) (rejecting the use of an "acquittal first" transition instruction and approving the use

20   of an "unable to agree" transition instruction). Rather, if the jurors were unable to agree on a verdict

21   on first-degree murder, they then could consider second-degree murder, without any requirement

22   stating that they must first reach unanimous agreement as to the acquittal on first-degree murder.

23

This claim lacks any legal or factual foundation, whether on *de novo*[9] or deferential review. Arthur is denied federal habeas relief for Ground 6.4.

### 4.    Jury Instruction No. 24

Arthur argues that Jury Instruction No. 24, the unanimity instruction, improperly permitted different jurors to reach the same conclusion based on different reasons and theories. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> Arthur argues that jurors are required to be unanimous regarding the theory of liability. However, Arthur's argument fails as we have consistently held that "[w]here the State proceeds on alternative theories of first-degree felony murder and willful, deliberate, and premeditated first-degree murder, . . . the jury need not unanimously agree on a single theory of the murder. Crawford v. State, 121 Nev. 744, 750, 121 P.3d 582, 586 (2005); see also Moore v. State, 116 Nev. 302, 304, 997 P.2d 793, 794 (2000); Walker v. State, 113 Nev. 853, 870, 944 P.2d 762, 773 (1997). Arthur urges this court to revisit its position. We decline to do so and conclude that the district court properly instructed the jury.

The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Jury Instruction No. 24 provides:

> Your verdict must be unanimous as to the charge. You do not have to be unanimous on the principle of criminal liability. It is sufficient that each of you find beyond a reasonable doubt that the murder, under any one of the principles of criminal liability, was murder of the first degree.

A jury need only agree that a defendant committed the offense, and jurors may generally base their conclusions on different theories of both the *actus reus* and *mens rea*. Schad v. Arizona, 501 U.S. 624, 632 (1991) (plurality opinion). Because the jury only needed to agree that Arthur

---

[9] Arthur urges the Court to review this claim *de novo* because the Nevada Supreme merely mentioned Franklin without applying it. ECF No. 66 at 59-60.

committed the offense of murder with the use of a deadly weapon, it was proper for the jurors to have potentially based their conclusions on different theories of *mens rea*—either that Arthur acted with premeditation and deliberation or that the killing occurred during the perpetration of a burglary. Because this claim lacks any legal or factual foundation, whether on *de novo*[10] or deferential review, Arthur is denied federal habeas relief for Ground 6.4.

### 5.    Jury Instruction No. 33

Arthur argues that because no Nevada statute defines knives as deadly weapons, Jury Instruction No. 33 directive that a knife is a deadly weapon eliminated the requirement that the State prove the deadly weapon element beyond a reasonable doubt. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> Arthur next argues that jury instruction no. 33 violates his due process rights because the instruction, not the jury, concludes that a knife is a deadly weapon. . . .
>
> Although the first paragraph of jury instruction no. 33 follows the statutory definition in NRS 193.165(6), it can be argued that the second paragraph improperly displaces the fact-finding duty of the jury to decide whether the knife in question was a deadly weapon. Nonetheless, we conclude that, based on the evidence presented in this case, a rational trier of fact could have found that the knife in question satisfied the statutory definition of a deadly weapon. Accordingly, we conclude that Arthur has failed to demonstrate that any error in the jury instruction violated his due process rights.

The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Jury Instruction No. 33 provided:

> "Deadly weapon" means any instrument which, if used in the ordinary manner contemplated by its design and construction, will or is likely to cause substantial

---

[10] Arthur urges the Court to review this claim *de novo* because the Nevada Supreme Court failed to address his constitutional arguments. ECF No. 66 at 63.

bodily harm or death; any weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death. You are instructed that a knife is a deadly weapon.

Although Jury Instruction No. 33 may have been an erroneous statement of Nevada law, as the Nevada Supreme Court noted, that is not enough to grant Arthur relief. Rather, he must prove that Jury Instruction No. 33 "so infected the entire trial that the resulting conviction violates due process." Henderson, 431 U.S. at 154. Arthur fails to meet this burden. As the Nevada Supreme Court reasonably determined, the jury could have rationally determined that the knife in question met the statutory definition of a deadly weapon. See Nev. Rev. Stat. § 193.165(6) (defining "deadly weapon" as "[a]ny instrument which, if used in the ordinary manner contemplated by its design and construction, will or is likely to cause substantial bodily harm or death" or "[a]ny weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death"). Indeed, at trial, it was not disputed that Arthur stabbed Andrade with a knife and that Andrade died due to that stabbing. Because the Nevada Supreme Court reasonably denied Arthur relief, Arthur is denied federal habeas relief for Ground 6.5.

### 6. Jury Instruction No. 38

Arthur argues that Jury Instruction No. 38, the reasonable doubt jury instruction, improperly used the word "until" which lessened the state's burden of proof in violation of his constitutional rights. Arthur elaborates that "until" should have been removed or replaced with "unless." Id. In affirming Arthur's conviction on direct appeal, the Nevada Supreme Court held:

> In Arthur's final challenge to the jury instructions, he contends that the use of the word "until" in jury instruction no. 38 subverts the presumption of innocence and reduces the State's burden of proof. . . .

We have previously addressed a challenge to this specific jury instruction in <u>Blake v. State</u>, 121 Nev. 779, 121 P.3d 567 (2005). In <u>Blake</u>, we determined that the challenged instruction followed the express language of NRS 175.191 and did not undermine the State's burden of proof or the presumption of innocence. <u>Id.</u> at 799, 121 P.3d at 580. Here, identical to the challenged jury instruction in <u>Blake</u>, jury instruction no. 38 expressly tracks the language in <u>Blake</u>, jury instruction no. 38 expressly tracks the language of NRS 175.191, provides NRS 175.211's definition of reasonable doubt, and concludes by instructing the jury that "[i]f you have a reasonable doubt as to the guilt of the [d]efendant, he is entitled to a verdict of not guilty." Therefore, we conclude that the jury was properly instructed and Arthur's argument is without merit.

The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Jury Instruction No. 38 provides:

The Defendant is presumed innocent until the contrary is proved. This presumption places upon the state the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense.

A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty.

"[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.'" <u>Victor v. Nebraska</u>, 511 U.S. 1, 5 (1994) (internal citation omitted) (quoting <u>Holland v. United States</u>, 348 U.S. 121, 140 (1954)). In assessing the constitutionality of a jury instruction, it must be determined "whether there is a

reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the <u>Winship</u> standard."[11] <u>Id.</u> at 6.

The Ninth Circuit evaluated a nearly identical reasonable doubt instruction in <u>Ramirez v. Hatcher</u>.[12] 136 F.3d 1209, 1210-11 (9th Cir. 1998). The Ninth Circuit held that "[a]lthough [it did] not herald the Nevada instruction as exemplary, [it] conclude[d] that the overall charge left the jury with an accurate impression of the government's heavy burden of proving guilt beyond a reasonable doubt" such that "the jury charge satisfied the requirements of due process." <u>Id.</u> at 1215; <u>see also</u> <u>Nevius v. McDaniel</u>, 218 F.3d 940, 944 (9th Cir. 2000) (holding that the reasonable doubt jury instruction was identical to the one in <u>Ramirez</u>, so "[t]he law of this circuit thus forecloses Nevius's claim that his reasonable doubt instruction was unconstitutional"). Because Jury Instruction No. 38's language has been determined to be constitutional by the Ninth Circuit, the Nevada Supreme Court reasonably concluded that the jury was properly instructed regarding reasonable doubt. Because the Nevada Supreme Court reasonably denied Arthur relief, Arthur is denied federal habeas relief for Ground 6.6.[13]

---

[11] The <u>Winship</u> standard states that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970).

[12] The only difference between the reasonable doubt jury instruction provided in Arthur's trial and the reasonable doubt jury instruction provided in *Ramirez* was the omission of the word "substantial." <u>Compare</u> ECF No. 31-2 at 39 (". . . Doubt to be reasonable must be actual, not mere possibility or speculation."), <u>with</u> <u>Ramirez v. Hatcher</u>, 136 F.3d 1209, 1210-11 (9th Cir. 1998) (". . . Doubt to be reasonable must be actual *and substantial*, not mere possibility or speculation.") (emphasis added). However, because "the use of the term 'substantial' to describe reasonable doubt has been disfavored," <u>Ramirez</u>, 136 F.3d at 1212, the reasonable doubt jury instruction provided in Arthur's trial was even more acceptable than the reasonable doubt jury instruction in <u>Ramirez</u>.

[13] Arthur also argues that the jury instructions in Ground 6 combined to deprive him of his constitutional rights. ECF No. 28 at 49; ECF No. 66 at 68. The Court disagrees, determining that the cumulative impact of the instructions does not warrant the granting of relief for the reasons discussed previously.

**G.      Ground 7**

In Ground 7, Arthur alleges that there was insufficient evidence to support his convictions. Arthur explains that there was insufficient evidence to prove that he entered the Andrade home with the intent to commit a felony, so his burglary conviction cannot stand. And since the burglary was the predicate felony for the felony-murder allegation, the felony murder liability theory of first-degree murder cannot stand either. Arthur further alleges that there was insufficient evidence to prove premeditation and deliberation. In affirming Arthur's judgment of conviction, the Nevada Supreme Court held:

> In this case, the record reflects that, although mostly circumstantial, the State presented evidence that Arthur was angry at the victim for hanging up the phone, that Arthur was banned from the victim's residence because of his drinking, that Arthur had previously stated that he was sent to kill the victim, and that he was seen in the area on the night of the murder. The State also presented evidence that Arthur knew that his children and their mother were not at home that evening, that Arthur's DNA was found throughout the house, that a struggle took place in the home, that the killing was of a violent and gruesome nature, and that Arthur attempted to clean the crime scene. And, finally, the State presented evidence showing that Arthur left the scene of the crime in the victim's vehicle, that he left a bottle of shampoo and latex gloves with blood stains in the trunk of the victim's car when he abandoned it, that he later fled from police, and he never notified anyone of the killing and later denied being involved or being at the victim's residence on the night of the murder. It was the jury's function to weigh the evidence and determine the credibility of the witnesses and decide whether Arthur's self-defense theory was plausible.
>
> Based on the evidence in the record, and viewing that evidence in the light most favorable to the prosecution, we conclude that there is sufficient evidence from which a reasonable jury could reject Arthur's theory of self defense and find him guilty beyond a reasonable doubt.

The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

_____

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The evidence is to be viewed "in the light most favorable to the prosecution." See id. Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of Jackson. See Juan H., 408 F.3d at 1275 n.13.

Sufficiency of the evidence claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324 n.16. Nevada law defines murder as "the unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied." Nev. Rev. Stat. § 200.010(1). And, as it relates to the facts of this case, first-degree murder is murder "which is (a) Perpetrated by means of poison, lying in wait or torture, or by any other kind of willful, deliberate and premeditated killing" or "(b) Committed in the perpetration or attempted perpetration of . . . robbery, burglary, [or] invasion of the home." Nev. Rev. Stat. § 200.030(1)(a), (b). Nevada law does not require "that the jury . . . unanimously agree on a single theory of . . . murder." Crawford v. State, 121 P.3d 582, 586 (Nev. 2005). And Nevada law provides that burglary occurs when "a person . . . by day or night, enters any house . . . with the intent to commit . . . assault or battery on any person or any felony." Nev. Rev. Stat. § 205.060.

The record in this case demonstrates that the State presented evidence that Arthur was not allowed to enter the Andrade home; that Arthur told a family member of Andrade that God had sent him to kill Andrade; that Arthur was upset at Andrade the night of the killing for hanging up the telephone on him while they were speaking; that Andrade knew that Taitano and her family members had gone out for the evening; that Andrade's killing was extremely brutal; that Arthur cleaned up the crime scene, disposed of his clothes, and moved Andrade's vehicle; that Arthur tried to evade law enforcement upon being stopped; that Arthur initially denied involvement in Andrade's killing and later alleged that he acted in self-defense; and that Arthur lied to a friend about being injured at a casino the night of the killing.

Although Arthur testified that he went to the Andrade's residence looking for Taitano and was invited inside by Andrade, viewing the foregoing evidence "in the light most favorable to the prosecution" (Jackson, 443 U.S. at 319), especially the fact that Arthur was upset at Andrade and knew he would be home alone, a rational trier of fact could have found beyond a reasonable doubt that Arthur entered the Andrade residence with the intent to commit a felony. And although Arthur testified that Andrade attacked him with a knife and he was forced to kill Andrade in self-defense, viewing the foregoing evidence "in the light most favorable to the prosecution" (Jackson, 443 U.S. at 319), especially considering the brutality of the killing and Arthur's questionable actions following the killing, a rational trier of fact could have found beyond a reasonable doubt that Arthur either killed Andrade willfully, deliberately and with premeditation or during the perpetration of burglarizing the Andrade home. As such, the Nevada Supreme Court's ruling that there was sufficient evidence to convict Arthur was reasonable. In re Winship, 397 U.S. at 364; Juan H., 408 F.3d at 1274; Jackson, 443 U.S. at 319; Nev. Rev. Stat. §§ 200.030, 205.060. Arthur is denied federal habeas relief for Ground 7.

**H.    Ground 8**

In Ground 8, Arthur argues that the cumulative errors raised in his direct appeal—Grounds 1 through 7 of his federal habeas petition—violated his federal constitutional rights. The Court agrees. Beyond the bases for granting of relief previously found by the Court, the Court also finds that the cumulative effect of the errors warrants relief here. Specifically, due to the cumulative impact of the errors previously discussed in Grounds 2.2, 3, and 4, this Court grants Arthur federal habeas relief on this ground as well.

**I.    Ground 9**

In Ground 9, Arthur argues that his federal constitutional rights were violated due to the ineffectiveness of his trial counsel. In <u>Strickland</u>, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u> at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under Strickland, establishing that the decision was unreasonable is especially difficult. See Harrington, 562 U.S. at 104–05. In Harrington, the United States Supreme Court clarified that Strickland and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. Id. at 105; see also Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's Strickland determination under AEDPA, both AEDPA and Strickland's deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 562 U.S. at 105.

The Court will now address Arthur's three ineffective-assistance-of-trial-counsel claims.

### 1.    Elicitation of Arthur's Silence

Arthur argues that his trial counsel erred by eliciting the fact that he chose to remain silent when law enforcement was interrogating him. Arthur explains that this prejudiced him because the State was then able to suggest that the only way Arthur could be telling the truth about acting in self-defense is if he had told investigating officers that at the time of his interrogation, rather than doing what he did and exercising his right to remain silent. In affirming the denial of Arthur's state post-conviction petition, the Nevada Supreme Court held:

> Arthur argues that trial counsel was ineffective in eliciting evidence that Arthur had invoked his right to remain silent during police questioning. Arthur has failed to demonstrate deficiency or prejudice. Trial counsel testified at the evidentiary hearing that this was a tactical move to help the jurors credit Arthur's testimony that his actions were in self-defense even though he had never mentioned self-defense before trial. Arthur cites no authority that prevents a defense attorney from eliciting such evidence, and he has failed to demonstrate that this is one of the extraordinary circumstances in which a tactical decision may be challenged. See

1
2
3
4

> Doleman v. State, 112 Nev. 843, 848, 921 P.2d 278, 280-81 (1996) (holding that tactical decisions are "virtually unchallengeable absent extraordinary circumstances" (quotation marks omitted)). Moreover, because counsel's actions were not error, Arthur has failed to demonstrate that, but for counsel's error, there was a reasonable probability of a different outcome at trial. We therefore conclude that the district court did not err in denying this claim.

5  The Nevada Supreme Court's rejection of Arthur's Strickland claim was neither contrary to nor

6  an unreasonable application of clearly established law as determined by the United States Supreme

7  Court.

8       During Arthur's trial counsel's direct examination of him, Arthur testified about being

9  chased by law enforcement and taken into custody. Arthur testified that he told law enforcement

10  that he would "tell them everything if [he] g[o]t to speak with [his] wife, to have her come back."

11  Taitano hung up the telephone when Arthur called and refused to come to the interview location.

12  Arthur's trial counsel then asked Arthur, "[w]hat did you tell the police at that point," and Arthur

13  replied, "I wanted to speak to a lawyer." Arthur then answered in the negative when asked, "[n]o

14  further conversation, no further interrogation by the police, I take it?"

15       At the post-conviction evidentiary hearing, Arthur's trial counsel stated that he meant to

16  ask Arthur the foregoing questions about invoking his right to an attorney and right to remain

17  silent, explaining:

18
19
20
21

> The rationale is [Arthur] didn't give any full explanation. I thought the State was going to argue the first time you've ever heard about self-defense is here in court. Nobody said anything at any point and I thought the lesser of two evils was to put on the fact that he had invoked his right, he hadn't said anything, he had a right to counsel and to use that as a shield to some extent for him not giving a statement to the police because it was glaringly obvious that he hadn't given a statement to the police.

22  Arthur's trial counsel also commented:

23
> In an optimum situation, if I'm going to have a self-defense case, I hope that the client has told somebody that this was in self-defense, I was defending myself. It

makes it much easier then coming off the street and never mentioned that to anybody before. When that doesn't happen, it becomes more difficult to couch things because the obvious question in the jury's mind, regardless of what the judge says, regardless of the instructions, the obvious question is always why didn't you tell somebody if you were simply defending yourself.

. . .

In my experience in a self-defense case, one of the questions on the jury's mind is always why didn't they tell somebody if they were defending themselves irrespective of what the prosecution has.

It is accurate, as Arthur notes, that the government may not comment on a defendant's post-arrest silence at trial. See Griffin v. California, 380 U.S. 609, 614 (1965); Doyle v. Ohio, 426 U.S. 610, 618 (1976) ("'[I]t it does not comport with due process to permit the prosecution during the trial to call attention to [a defendant's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.'"). But, as the Nevada Supreme Court reasonably noted, Arthur fails to cite any caselaw demonstrating that his own counsel was deficient for making such a comment. Rather, Arthur's trial counsel's testimony at the post-conviction evidentiary hearing made it clear that it was a strategic decision to discuss Arthur's right to remain silent, as it addressed why Arthur failed to mention that he acted in self-defense at the time of his law enforcement interview. See Harrington, 562 U.S. at 107 (2011) ("Counsel was entitled to formulate a strategy that was reasonable at the time."). This was a sound tactical decision. Because the Nevada Supreme Court reasonably determined that Arthur's trial counsel was not deficient, Strickland, 466 U.S. at 688, Arthur is denied federal habeas relief for Ground 9.1.

## 2.    Conceding Guilt

Arthur argues that his trial counsel erred by conceding that Arthur was guilty of voluntary manslaughter. In affirming the denial of Arthur's state post-conviction petition, the Nevada Supreme Court held:

> Arthur argues that trial counsel was ineffective in conceding his guilt at trial. The district court's finding that Arthur's claim was belied by the record is supported by substantial evidence in the record. The statement Arthur highlights was part of a larger argument that he acted in self-defense or, if the jury did not believe that, then that he committed only voluntary manslaughter. We therefore conclude that the district court did not err in denying this claim. See Hargrove v. State, 100 Nev. 498, 503, 686 P.2d 222, 225 (1984) (concluding no relief warranted where claims are belied or repelled by the record).

The Nevada Supreme Court's rejection of Arthur's Strickland claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Arthur takes issue with the italicized portion of his trial counsel's closing argument:

> Reasonable minds can differ. The real key question here is whether if you think this went beyond self-defense, there's reasonable provocation, and whether or not a reasonable person, any reasonable person in George's position would have acted on and used deadly force. *If you think so, if you don't think the State has proven the contrary, actually, then what we're talking about is voluntary manslaughter, even if you set self-defense aside. But self-defense is there in the instructions.*

At the post-conviction evidentiary hearing, Arthur's trial counsel stated that he made this comment because "in a case like this, you're hoping for a compromised verdict a lot of times." Arthur's trial counsel elaborated that he was not conceding guilt by this statement; rather, he was giving the jury another option besides first-degree murder because he did not "have high hopes for a not guilty because of self-defense" verdict due to the brutality of the killing.

"An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." Florida v. Nixon, 543 U.S. 175,

187 (2004); see also Strickland, 466 U.S. at 688 (noting counsel's duty to consult with the defendant on important decisions). However, as the Nevada Supreme Court reasonably determined, the facts do not support Arthur's contention that his trial counsel conceded guilt, thereby violating his duty of consultation. Arthur's trial counsel spent considerable time during his closing argument focusing on self-defense. His one sentence comment that voluntary manslaughter was another option to consider—indeed, it was one of the seven options available on the verdict form for the murder count does not amount to a concession of guilt. Thus, even if the Court were to evaluate this claim de novo as Arthur urges, see ECF No. 66 at 78, it cannot be determined that Arthur's trial counsel acted deficiently. Strickland, 466 U.S. at 688. Arthur is denied federal habeas relief for Ground 9.2.

### 3.     Failure to Investigate

Arthur argues that his trial counsel failed to obtain psychological information and a psychological examination of him, to investigate Lori Rios, and to investigate Andrade's violent background. Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. Additionally, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. This investigatory duty includes investigating the defendant's "most important defense," Sanders v. Ratelle, 21 F.3d 1446, 1457 (9th Cir. 1994), and investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999). When the record demonstrates that trial counsel was well-informed, and the defendant fails to provide what

additional information would have been gained by the investigation he now claims was necessary, an ineffective assistance claim fails. Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986).

### a.    Psychological Information and Examination

Arthur argues that his trial counsel failed to obtain psychological information and a psychological examination of him. Arthur explains that had his trial counsel taken the minimal steps to uncover his mental condition, they could have presented a different defense, arguing that his mental illness made it impossible for him to form the specific intent to commit burglary or murder. In reversing the original granting of Arthur's state post-conviction petition, the Nevada Supreme Court held:

> [T]he State argues that the district court erred in determining that Arthur's trial counsel were ineffective for failing to investigate Arthur's mental health prior to trial. In support of this claim, Arthur produced documents stemming from his pretrial confinement in the Clark County Detention Center that briefly discuss his treatment for mental health issues. The district court concluded that counsel were ineffective for failing to obtain Arthur's jail records, which would have revealed that Arthur had mental health issues, and that such revelation would have prompted counsel to pursue a different defense. At the evidentiary hearing, the parties discussed the potential for an insanity defense based in part on the jail records.

> We conclude that the district court erred in concluding that counsel's performances were deficient. At the evidentiary hearing, counsel discussed their pretrial investigation and decisions concerning self-defense in this case. First, the lead counsel testified that he makes a case-by-case consideration of whether to request records pertaining to a client from the jail, the jail sends a copy of those records to the State and that such records often contain information damaging to the defense. Counsel testified that such concerns would have been why he did not request Arthur's records from the Clark County Detention Center. Second, counsel testified that Arthur was adamant that he killed the victim in self-defense and counsel pursued investigations aimed at helping that defense.

> As discussed previously, defense counsel has a duty to make reasonable investigations or make a reasonable decision not to undertake a particular course of investigation. Love, 109 Nev. at 1138, 865 P.2d at 323. Here, counsel made a reasonable tactical decision regarding the direction of the pretrial investigation based on his experience and upon the circumstances known to him in this case. Tactical decisions made by counsel, such as the decision not to obtain jail records, "are virtually unchallengeable absent extraordinary circumstances," Ford, 105 Nev.

at 853, 784 P.2d at 953, and Arthur does not demonstrate extraordinary circumstances here.

Counsel also reasonably declined to investigate facts to support an insanity defense. As stated previously, defense counsel testified that Arthur was adamant that the killing was done in self-defense. Counsel testified that they both met with Arthur prior to trial and had no indication from him that he suffered from any delusion during the commission of the killing such that they should have pursued an insanity defense. This is particularly important in light of this court's conclusion that a criminal defendant personally, and not his or her counsel, has the authority to pursue a defense of insanity. See Johnson v. State, 117 Nev. 153, 163, 17 P.3d 1008, 1015 (2001). Moreover, where there is no indication pretrial that a criminal defendant suffered from psychological disorders that may have impaired his mental state at the time of the crime, counsel is not ineffective for declining to investigate the defendant's mental health. See Riley v. State, 110 Nev. 638, 650-51, 878 P.2d 272, 280 (1994); see also Dumas v. State, 111 Nev. 1270, 1272, 903 P.2d 816, 817 (1995) (explaining that the circumstances in that case should have caused counsel to investigate the defendant's mental health, but recognizing that defense counsel may have "cogent reasons for not pursuing the defendant's psychopathy"). Under the circumstances of this case, the pursuit of facts to support Arthur's statements that the killing was done in self-defense was a reasonable tactical decision given the facts known to counsel and Arthur's assertion that he acted in self-defense. See Ford, 105 Nev. at 853, 784 P.2d at 953; see also Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions").

The district court also erred in concluding that Arthur was prejudiced by trial counsel's failure to investigate Arthur's mental health prior to trial. Arthur had the burden of proving the factual allegations underlying his ineffective-assistance-of-counsel claims by a preponderance of the evidence. See Means v. State, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). In support of this claim, Arthur provided the previously mentioned jail records that briefly discussed Arthur's diagnoses and medications. Arthur also provided Nevada Department of Corrections inmate request forms where he had requested information regarding his medication and diagnoses. However, Arthur did not present expert testimony regarding his mental health at the evidentiary hearing. The district court did not make specific findings about Arthur's proof regarding mental health difficulties, but stated in its order and at the evidentiary hearing that had counsel obtained the jail records, counsel may have pursued a different defense at trial, such as an insanity defense.

Arthur's jail and prison documents fail to demonstrate by a preponderance of the evidence that during the killing he was "in a delusional state preventing him from knowing or understanding the nature of his act or from appreciating the wrongfulness of his act." Blake, 121 Nev. at 793, 121 P.3d at 576. None of the records provided by Arthur on post-conviction discuss in any detail his mental difficulties or provide any information regarding whether Arthur actually acted in

a delusional state during the killing. See Miller v. State, 112 Nev. 168, 172, 911 P.2d 1183, 1185 (1996) (stating "a successful insanity defense must show the elements of [legal insanity] existed at the time of the act". The general and brief information produced by Arthur simply fails to demonstrate a reasonable probability that a jury would have found Arthur not guilty by reason of insanity had counsel obtained this information. To the extent that the jail records could have prompted further investigation into Arthur's mental health, the record is silent as to what counsel could have discovered, if anything. Arthur has not addressed the type or quality of mental evidence his counsel could have uncovered with more investigation, and therefore, he fails to demonstrate a reasonable probability of a different outcome had counsel conducted further investigation into his mental health. See Molina v. State, 120 Nev. 185, 192, 87 P.3d 533, 538 (2004). Therefore, the district court erred in granting relief on this claim.

The Nevada Supreme Court's rejection of Arthur's Strickland claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

It appears that Arthur suffered from a variety of mental health issues prior to and following his trial. In fact, prior to his trial, Arthur filled out an inmate request form indicating that he needed medication for his "bipolar disease." There were also indications that Arthur was suffering from auditory and visual hallucinations. Following his conviction, it was reported that Arthur suffered from schizophrenia and depression.

Arthur's first-chair and second-chair trial counsel testified at the post-conviction evidentiary hearing that they were not concerned with Arthur's competency or any psychological issues such that a psychological examination needed to be requested. However, if Arthur's first-chair trial counsel had seen Arthur's jail records showing that he needed medication for his bipolar condition and was suffering from hallucinations, he would have explored "a mental health angle" by "probably sen[ding] a doctor over to talk with [Arthur]." That being said, Arthur's first-chair trial counsel would not have expected that investigation to have "ma[d]e any difference on how [he] defended the case" because he believed that "the alcohol in this case was more helpful than

[any] evidence of delusions and hallucinations.". This assessment was due to the fact that Nevada law doesn't recognize diminished capacity and Arthur's mental health issues would not have been enough to argue insanity, "[s]o putting [Arthur] on to say that he's delusional, crazy, whatever else" would only act to "undermine his credibility" and weaken his testimony that he acted in self-defense. And in this case, Arthur was "adamant that he wanted to go with self-defense."

The Nevada Supreme Court reasonably determined that Arthur's trial counsel were not deficient. Strickland, 466 U.S. at 688. As the Nevada Supreme Court reasonably noted, Arthur's trial counsel reasonably decided to pursue facts that would support Arthur's assertion that he acted in self-defense. See Tuck v. White, 116 F.3d 1264 (9th Cir. 1997) ("[O]nce [counsel] reasonably selected the self-defense theory, his duty to investigate the competency defense, which directly conflicted with the self-defense theory, ended."). Indeed, Arthur's trial counsel soundly explained that investigating and presenting a mental health issue not amounting to a lack of competency would only have diminished Arthur's testimony that he acted in self-defense. Strickland, 466 U.S. at 691; see also Harrington, 562 U.S. at 109 (explaining that "[c]ounsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies"). Because the Nevada Supreme Court reasonably denied Arthur's ineffective-assistance-of-counsel claim, Arthur is denied federal habeas relief for Ground 9.3(a).

### b.    Rios

Arthur argues that his trial counsel failed to investigate Rios, whose testimony was discussed in Ground 3. Arthur elaborates that if his trial counsel had investigated Rios, they would have learned about her damaging testimony before trial and, more importantly, based on the statements he allegedly made to Rios, they would have learned about and explored his mental

health. In reversing the original granting of Arthur's state post-conviction petition, the Nevada

Supreme Court held:

> [T]he State argues that the district court erred in determining that Arthur's trial counsel were ineffective for failing to investigate and interview a State's witness, Lori Rios. The State endorsed Rios as a witness, but listed her contact information as unknown. At the evidentiary hearing, defense counsel testified that they discussed Rios with the State in an effort to ascertain whether they should pursue further investigation of her potential testimony and whether the State actually possessed her contact information. During that conversation, the State informed counsel that the State had only listed Rios as a witness out of an abundance of caution as she was a family member of the victim who resided in Las Vegas and possibly could have pertinent information about the crime. The State reiterated to defense counsel that it did not possess Rios' contact information and informed defense counsel that the State was not likely to present Rios' testimony at trial. Defense counsel also conferred with Arthur, who indicated that he did not believe that Rios had any pertinent information. Defense counsel testified that, as a result of the conversations with the State and Arthur, they did not pursue further investigation of Rios' potential testimony.
>
> Rios, however, attended the trial and during a break, a prosecutor spoke with Rios and learned that approximately one month prior to the killing, Arthur had told her that God had sent him to kill the victim. Defense counsel objected to Rios' testimony due to the lack of contact information and the objection was overruled by the district court. Counsel then cross-examined Rios at length regarding her failure to disclose this information to the State or the police at any point prior to the trial. The State argued in closing that Rios' testimony, combined with the additional evidence presented at trial, demonstrate that Arthur acted with premeditation and did not kill the victim in self-defense.
>
> The district court concluded that counsel was ineffective for failing to pursue further investigation of Rios and her potential testimony. The district court's order states that had counsel been aware that Arthur had told Rios that God wanted him to kill the victim, counsel would have been aware of Arthur's psychological difficulties and chosen to pursue a difference defense. At the evidentiary hearing, the parties discussed the potential for an insanity defense based in part on Rios' testimony that Arthur was told to kill by God.
>
> We conclude that the district court erred in concluding that counsel's performances were deficient. "[D]efense counsel has a duty 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" State v. Love, 109 Nev. 1136, 1138, 865 P.2d 322, 323 (1993) (quoting Strickland, 466 U.S. at 691). Defense counsel's "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." Strickland, 466 U.S. at 691. "Where counsel and the client in a criminal case clearly understand the

evidence and the permutations of proof and outcome, counsel is not required to unnecessarily exhaust all available public or private resources." Molina v. State, 120 Nev. 185, 192, 87 P.3d 533, 538 (2004). Here, defense counsel testified that they questioned the State regarding Rios' potential testimony and her contact information and relied upon the State's assertions that Rios was unlikely to testify as the State did not know at that time the value of Rios' testimony or how to contact her. Arthur also told them that he did not believe that Rios knew any important information. In addition, counsel testified that Arthur was adamant that he acted in self-defense. Given the representations by the State and Arthur, counsel chose not to spend additional time and resources investigating a witness who, given the information known to counsel before the start of trial, did not appear to possess helpful or pertinent information. Tactical decisions made by counsel, such as which witnesses to interview or investigate, "are virtually unchallengeable absent extraordinary circumstances." Ford v. State, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989). Under these circumstances, defense counsel's decision to not spend time and effort on investigating a witness for whom the State did not possess contact information, that the State did not intend to call at trial, and that the defendant did not believe had useful information was an objectively reasonable decision.

The district court also erred in concluding that Arthur was prejudiced by the failure to investigate Rios as her testimony regarding Arthur's statement about God telling him to kill the victim would not have supported an insanity defense. "To be legally insane, a defendant must be in a delusional state preventing him from knowing or understanding the nature of his act or from appreciating the wrongfulness of his act." Blake v. State, 121 Nev. 779, 793, 121 P.3d 567, 576 (2005); see also NRS 174.035(5) (codifying Nevada's standard for legal insanity). Nevada's legal insanity standard

> Permits a finding of legal insanity only if at the time of the killing, a delusional state: (1) rendered the defendant incapable of knowing or understanding the nature of his act, i.e., that he was killing a human being, or (2) prevented the defendant from appropriating the wrongfulness of his act, i.e., that the killing was not justified under the law.

Blake, 121 Nev. at 801-02, 121 P.3d at 581 (Becker, C.J., concurring in part and dissenting in part). Arthur's statements to Rios that God sent him to kill the victim does not meet either requirement for insanity. It did not demonstrate that Arthur was rendered incapable of knowing the nature of his act as he specifically stated he was sent to kill a human being. It also did not demonstrate that Arthur did not appreciate the wrongfulness of his acts or that the killing was not justified under the law. Arthur's statement best fits under the irresistible impulse test for legal insanity, a standard specifically not adopted by Nevada. See Finger v. State, 117 Nev. 548, 558, 27 P.3d 66, 73 (2001). Moreover, this court has already concluded that a scenario similar to the one presented in this case, one where a criminal defendant believed that God wanted him to kill and acted under that impulse, would not meet Nevada's legal insanity standard. See id. Accordingly, the district court

1  erred in concluding that there is a reasonable probability of a different outcome at
2  trial had counsel investigated Rios.

3  The Nevada Supreme Court's rejection of Arthur's <u>Strickland</u> claim was neither contrary to nor
4  an unreasonable application of clearly established law as determined by the United States Supreme
5  Court.

6      Arthur's first-chair trial counsel testified at the post-conviction evidentiary hearing that he
7  did not know the substance of Rios' testimony until she testified and that he "felt ambushed."
8  Arthur's second-chair trial counsel elaborated that the State had "told [them] that [Rios] was
9  merely a member of the family and [the State was] just noticing her in an abundance of caution
10 [and] that they had no idea what she was gonna [sic] say." The State also told Arthur's trial counsel
11 that it did not have Rios' contact information and/or telephone number. In an effort to further
12 investigate, Arthur's trial counsel asked him if he knew why Rios would be on the State's witness
13 list, and Arthur responded that he did not "remember saying anything to her" and did not know
14 "why she would ever testify."

15      The Nevada Supreme Court reasonably determined that Arthur's trial counsel were not
16 deficient. <u>Strickland</u>, 466 U.S. at 688. As the Nevada Supreme Court reasonably noted, Arthur's
17 trial counsel contacted the State about Rios' potential testimony, attempted to get Rios' contact
18 information, and questioned Arthur about Rios' potential testimony. Because the State told
19 Arthur's trial counsel that Rios was only being noticed out of an abundance of caution and because
20 Arthur did not inform his trial counsel that Rios would have anything damaging to say at trial, it
21 was reasonable for Arthur's trial counsel to have decided not to investigate further. <u>Strickland</u>, 466
22 U.S. at 691; <u>see also</u> <u>Yarborough v. Gentry</u>, 540 U.S. 1, 8 (2003) ("The Sixth Amendment
23 guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").

57

Because the Nevada Supreme Court reasonably denied Arthur's ineffective-assistance-of-counsel claim, Arthur is denied federal habeas relief for Ground 9.3(b).

### c.    Andrade's Background

Arthur argues that his trial counsel should have investigated Andrade's violent background to help support Arthur's claim of self-defense. In reversing the original granting of Arthur's state post-conviction petition, the Nevada Supreme Court held:

> [T]he State argues that the district court erred in determining that Arthur's trial counsel were ineffective for failing to investigate the victim's violent background. Evidence presented at the evidentiary hearing demonstrated that the victim had been arrested approximately 20 years prior to his death for battery, that the defense knew of his arrest, but that the defense did not present this evidence during the trial because the trial court had informed them in an off-the-record discussion that it would permit the State to introduce Arthur's violent background if they sought admission of this evidence. Evidence presented at the evidentiary hearing also indicated that Arthur had been aware of the victim's arrest prior to the night of the killing. The district court concluded that counsel were ineffective for failing to investigate the victim's violent background and for failing to ensure that the trial court's ruling on this evidence was placed on the record so as to be preserved for direct appeal.

> We conclude that the district court erred in concluding that counsel's performances were deficient. The record belies Arthur's claim that counsel did not investigate the victim's violent background. At the evidentiary hearing, counsel testified that they investigated the victim's criminal history and the defense knew that the victim had been arrested for battery. Counsel also testified that the trial court's ruling essentially tied their hands. They knew of Arthur's criminal history, which was much more recent and much more significant than the victim's history. Counsel in particular did not want the jury to hear about Arthur's domestic violence toward Arthur's common-law wife, the victim's step-daughter. Accordingly, counsel made a tactical decision not to seek admission of the victim's use of violence in an attempt to shield from the jury Arthur's past violent conduct. Under the circumstances of this case and the [sic] given the ruling made by the trial court, these were reasonable tactical decisions. Ford, 105 Nev. at 853, 784 P.2d at 953. Therefore, the district court erred in concluding that counsel were not reasonably diligent with respect to use of evidence pertaining to the victim's violent background.

> The district court also erred in concluding that Arthur was prejudiced by the failure to investigate the victim's violent background and for failing to challenge the trial court's ruling with respect to introduction of this evidence. As stated previously, defense counsel knew of the victim's arrest for battery and Arthur does not

demonstrate that there were any additional violent incidents involving the victim that could have been discovered. See Molina, 120 Nev. at 192, 87 P.3d at 538. Had counsel sought to introduce evidence of the victim's battery arrest, Arthur does not demonstrate that there was a reasonable probability of a different outcome at trial. The victim's use of violence was remote and not likely to have held much persuasive weight given that the charge did not result in a conviction. In contrast, the evidence demonstrating Arthur's guilt was strong.

Evidence produced at trial demonstrated that Arthur was not welcome inside of his estranged wife's home due to his alcoholism and that the victim had initiated those restrictions. Arthur talked to his estranged wife on the night of the murder and she testified that Arthur was angry at the victim due to an earlier phone call between the two. The evidence demonstrated that Arthur went to the victim's house while the rest of the family was out, that the victim suffered multiple and significant stab wounds to his head, back and neck, and that the victim had extensive defensive wounds. The assailant had attempted to clean the scene following the incident and Arthur's blood was discovered throughout the crime scene. Arthur then took the victim's car, left it a short distance from the house, and left the area in his own vehicle. The next day, Arthur met with an acquaintance and told that person that he had been in an altercation at a casino with two African Americans the night before. A few days later, police officers initiated a traffic stop of Arthur, but he led them on a high speed chase of approximately 40 miles with speeds exceeding 100 mph. After his arrest, Arthur was recorded telling his estranged wife that he had had nothing to do with her step-father's death, but asserted that he acted in self-defense at trial.

In light of the evidence of Arthur's guilt, the victim's 20-year-old battery arrest that did not result in a conviction had little probative value in determining the events of the night in question. Accordingly, Arthur does not demonstrate prejudice stemming from counsel's actions or inactions regarding the victim's battery arrest. Therefore, the district court erred in granting relief on this claim.

The Nevada Supreme Court's rejection of Arthur's Strickland claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Andrade was charged with a misdemeanor battery in California in 1987, but the charge was dismissed. Arthur's first-chair trial counsel testified at the post-conviction evidentiary hearing that this battery charge may have had some value at Arthur's trial, but he did not want to introduce it to the jury for fear of hurting his credibility since he lacked proof of the battery's existence. Indeed,

59

Arthur's second-chair trial counsel testified that although Arthur told them about Andrade's criminal issue, they were unable to find any record of the charge through the research tools available to them. And Arthur's first-chair trial counsel explained that they did not research the charge further because "it was 20 years old and there was no conviction." Further, Arthur's second-chair trial counsel indicated that he "got the impression from [the state district court] that if [they] brought up [Andrade's] violent history, the State would be allowed to bring in [Arthur's] violent history." This pronouncement was concerning to defense counsel because "a misdemeanor battery in California [was] not worth risking [Arthur's] violent history coming into th[e] case."

The Nevada Supreme Court reasonably determined that Arthur's trial counsel were not deficient. Strickland, 466 U.S. at 688. As the Nevada Supreme Court reasonably noted, Arthur's trial counsel attempted to research Andrade's battery charge and ultimately decided that introducing this evidence would do more harm than good in light of the state district court's announcement that it would allow the State to admit Arthur's violent past conduct if Arthur introduced Andrade's battery. This was a sensible decision, especially considering that Andrade's battery was more than twenty years old and was dismissed. Because the Nevada Supreme Court reasonably denied Arthur's ineffective-assistance-of-counsel claim, Arthur is denied federal habeas relief for Ground 9.3(a).[14]

---

[14] Arthur argues that although it may have been reasonable for his trial counsel to have refrained from introducing Andrade's battery charge due to the state district court's indication that it would open the door for Arthur's violent conduct to be admitted, this strategy transformed into an unreasonable one when Arthur's violent conduct was admitted anyway through Taitano's testimony. ECF No. 66 at 93-94. As was explained further in Ground 2.1, Taitano testified that Arthur would sometimes become violent and put his hands on her when he was intoxicated. See ECF No. 30-1 at 9. Although this evidence of Arthur's past conduct was admitted, it was limited, and specific instances were not mentioned. It is, therefore, unfair to state that Arthur's trial counsel's strategy in refraining from introducing Andrade's dismissed battery charge was no longer valid.

1          **4.      Cumulative Error**

2          Arthur argues that the cumulative errors of his trial counsel's ineffectiveness entitle him to

3    relief. In reversing the original granting of Arthur's state post-conviction petition, the Nevada

4    Supreme Court held:

> [T]he State argues that the district court erred in determining that the cumulative errors of counsel amounted to ineffective assistance of counsel. As discussed previously, we conclude that Arthur did not meet his burden below to demonstrate that his trial counsel's performances were deficient. Therefore, there are no claims of counsel error to consider cumulatively and Arthur was not entitled to relief for this claim.

9    Because Arthur has failed to demonstrate that his trial counsel acted deficiently, there are no errors

10   to accumulate, and the Nevada Supreme Court reasonably denied Arthur relief.[15]

11        **J.      Ground 11**

12        In Ground 11, Arthur argues that his federal constitutional rights were violated due to the

13   ineffectiveness of his appellate counsel. The <u>Strickland</u> standard outlined in Ground 9 is also

14   utilized to review appellate counsel's actions: a petitioner must show "that [appellate] counsel

15   unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and

16   then "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner]

17   would have prevailed on his appeal." <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000). The Court will

18   now address Arthur's three ineffective-assistance-of-appellate-counsel claims.

19        **1.      Elicitation of Arthur's Silence**

20        Arthur argues that his appellate counsel failed to raise a claim on direct appeal that the

21   elicitation of his guilt by his trial counsel was unconstitutional. Arthur explains that by failing to

22   raise this claim on direct appeal, he was forced to raise it as an ineffective-assistance-of-counsel

23

---

[15] Ground 10 will be discussed with Ground 11.3.

claim in his post-conviction petition, thereby requiring that he meet a more difficult test. In

affirming the denial of Arthur's state post-conviction petition, the Nevada Supreme Court held:

> Arthur argues that appellate counsel was ineffective for not arguing on appeal that
> trial counsel had elicited Arthur's invocation of his right to remain silent . . . . For
> the reasons discussed previously, Arthur failed to demonstrate that appellate
> counsel was deficient or that he was prejudiced. To the extent Arthur argues that
> appellate counsel was ineffective for failing to raise claims of ineffective assistance
> of trial counsel, we disagree. See Pellegrini v. State, 117 Nev. 860, 882-83, 34 P.3d
> 519, 534 (2001) (noting that claims of ineffective assistance of trial counsel are
> generally inappropriate on direct appeal). We therefore conclude that the district
> court did not err in denying these claims.

As the Court noted in Ground 9.1, Arthur fails to cite any caselaw demonstrating that his

own trial counsel—rather than the government—violated his constitutional rights when he

commented on his post-arrest silence at trial. Because this legal issue lacks merit, the Nevada

Supreme Court reasonably determined that Arthur's appellate counsel was not deficient for not

including it in his direct appeal. Smith, 528 U.S. at 285. Arthur is denied federal habeas relief for

Ground 11.1.

## 2.    Conceding Guilt

Arthur argues that his appellate counsel failed to raise a claim on direct appeal that the

concession of Arthur's guilt by his trial counsel was unconstitutional. Arthur explains that by

failing to raise this claim on direct appeal, he was forced to raise it as an ineffective-assistance-of-

counsel claim in his post-conviction petition, requiring that he meet a more difficult test. In

affirming the denial of Arthur's state post-conviction petition, the Nevada Supreme Court held:

> Arthur argues that appellate counsel was ineffective for not arguing on appeal that
> trial counsel . . . conceded Arthur's guilt without first obtaining permission. For the
> reasons discussed previously, Arthur failed to demonstrate that appellate counsel
> was deficient or that he was prejudiced. To the extent Arthur argues that appellate
> counsel was ineffective for failing to raise claims of ineffective assistance of trial
> counsel, we disagree. See Pellegrini v. State, 117 Nev. 860, 882-83, 34 P.3d 519,
> 534 (2001) (noting that claims of ineffective assistance of trial counsel are generally

inappropriate on direct appeal). We therefore conclude that the district court did not err in denying these claims.

As the Court noted in Ground 9.2, the facts do not support Arthur's contention that his trial counsel conceded guilt. Instead, Arthur's trial counsel merely commented that voluntary manslaughter was another option for the jury to consider. Because this legal issue lacks merit, the Nevada Supreme Court reasonably determined that Arthur's appellate counsel was not deficient for not including it in his direct appeal. Smith, 528 U.S. at 285. Arthur is denied federal habeas relief for Ground 11.2.

### 3.    Shifting of Burden

Arthur argues that his appellate counsel failed to raise a claim on direct appeal regarding the State improperly shifting the burden of proof during closing arguments. Arthur explains that by failing to raise this claim on direct appeal, he was forced to raise it as an ineffective-assistance-of-counsel claim in his post-conviction petition, requiring that he meet a more difficult test. In affirming the denial of Arthur's state post-conviction petition, the Nevada Supreme Court held:

> Arthur argues that appellate counsel was ineffective for failing to challenge the State's rebuttal argument as shifting the burden of proof. Arthur has failed to demonstrate deficiency and prejudice. Arthur does not explain how the challenged comments—which outlined what the State felt that the jury would have to believe and to find self-defense—shifted the burden of proof. He has thus failed to demonstrate that counsel was objectively unreasonable in not raising this claim. Further, because the comments did not shift the burden of proof, he has failed to demonstrate a reasonable probability of a different outcome on appeal had counsel raised the issue. We therefore conclude that the district court did not err in denying this claim.

The Nevada Supreme Court's rejection of Arthur's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Arthur takes issue with the follow statements made by the State during its closing argument:

> You would have to believe that in the defendant's own mind each and every one of those blows was absolutely necessary to stop the threat of Sam Andrade.

> You would have to believe that the force used behind every [sic] each and every one of those blows was based out of the imminent fear of death that you would have to believe was going on [sic] his mind, that it wasn't based out of revenge or anger.

> Because under the law, ladies and gentlemen, if that's why he killed Sam he doesn't get self-defense and he can't get to not guilty. You would have to believe that his actions are the actions of a reasonable person in that situation.

> That's the standard that you get to compare, a reasonable person, would a reasonable person in that situation have buried a knife into Sam Andrade's head 11 times, and slit Sam Andrade's throat three times, stabbing him in the front and stabbed him in the back.

> Because if those aren't the actions of a reasonable person, he doesn't get self-defense.

> You would have to believe all of that, ladies and gentlemen; not just some of it, but all of it for this to be a case of self-defense and for him to be not guilty. That's the question that you have to answer. Is that what really happened. That's one question.

It is true, as Arthur contends, that the State is prohibited from using burden-shifting that relieves it of its burden of proving every element beyond a reasonable doubt. See Sandstrom v. Montana, 442 U.S. 510, 520-24 (1979). And in Nevada, "[i]f evidence of self-defense is present, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense." Runion v. State, 13 P.3d 52, 59 (Nev. 2000). However, it cannot be determined that the foregoing comments made by the State can be interpreted as stating that Arthur must prove that he acted in self-defense—rather than the State proving that he did not act in self-defense—thereby amounting to burden-shifting. As the Nevada Supreme Court reasonably noted, the State was simply outlining what it believed the jury would have to find to decide that Arthur was not guilty. Further, the jury

64

1    was properly instructed that "[i]f evidence of self-defense is present, the State must prove beyond

2    a reasonable doubt that the defendant did not act in self-defense." Therefore, because this burden-

3    shifting issue lacks merit, the Nevada Supreme Court reasonably determined that Arthur's

4    appellate counsel was not deficient for not including it in his direct appeal. <u>Smith</u>, 528 U.S. at 285.

5    Arthur is denied federal habeas relief for Ground 11.3.

6          Relatedly, in Ground 10, Arthur argues the underlying legal issue of Ground 11.3: that his

7    federal constitutional rights were violated when the State improperly shifted the burden of proof.

8    The Nevada Supreme Court held that this claim was procedurally barred and that "Arthur has

9    failed to demonstrate good cause and prejudice to overcome the bar. <u>See</u> NRS 34.810(1)(b)."

10    Arthur contends the Nevada Supreme was wrong because he can demonstrate good cause and

11    prejudice based on the ineffective assistance of his appellate counsel. However, because the Court

12    has already determined that Arthur's appellate counsel was not ineffective for failing to include

13    this claim in his direct appeal, Arthur cannot demonstrate good cause and prejudice and is denied

14    federal habeas relief for Ground 10.[16]

15    **IV.    CONCLUSION**

16          **IT IS THEREFORE ORDERED** that the First Amended Petition for Writ of Habeas

17    Corpus (ECF No. 28) is **GRANTED** as to Grounds 2.2, 3, 4, and 8. Petitioner George Chester

18    Arthur's judgment of conviction filed on July 3, 2008, in case number C232797, in the Eighth

19    Judicial District Court for the State of Nevada is vacated. Within 120 days[17] of the later of (1) the

20    conclusion of any proceedings seeking appellate or certiorari review of this Court's judgment, if

21    affirmed, or (2) the expiration for seeking such appeal or review, Arthur shall be released from all

22    _____

23    [16] Arthur requests that the Court conduct an evidentiary hearing. ECF No. 28 at 66. This Court declines to do so because it is able to decide the petition on the pleadings.

[17] Reasonable requests for modification of this time may be made by either party.

custody and/or other restraints, including parole or other supervision, unless the State files a written election in this matter of its intention to retry Arthur and thereafter commences jury selection.

**IT IS FURTHER ORDERED** that, to the extent necessary, a certificate of appealability is denied for Grounds 1, the remainder of 2, 5, 6, 7, 9, 10, and 11.

**IT IS FURTHER ORDERED** that the Clerk of the Court (1) enter judgment accordingly, (2) provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court for the State of Nevada in connection with that court's case number C232797, and (3) close this case.

**Dated: April 15, 2025**

_____
**RICHARD F. BOULWARE, II**
UNITED STATES DISTRICT JUDGE